SUPERIOR WIRE AND PAPER PRODUCTS, LTD. *v.* TALCOTT TOOL AND MACHINE, INC., ET AL.

BOGDANSKI, C. J., PETERS, HEALEY, ARMENTANO and SHEA, Js.

Argued March 12—decision released April 28, 1981

*Martin A. Gould,* with whom, on the brief, was *Andrew L. Freeman,* for the appellants (defendants).

*H. David Leventhal,* with whom was *Gerald L. Garlick,* for the appellee (plaintiff).

PETERS, J. This case arises out of a series of contracts for the sale of steel rod and wire. The plaintiff seller, Superior Wire and Paper Products, sued the defendant buyer, Talcott Tool and Machine, Inc., and the defendant guarantors, George Roy, Alan Roy and Roy Machinery & Sales, Inc., to recover the unpaid purchase price of shipments of steel. The defendants, by their answer and counterclaim, put into issue the conformity of the goods tendered, and sought damages for breach of warranty. The defendant guarantors also challenged the enforceability of their guaranty. The trial court found all of the issues for the plaintiff, and accordingly rendered a judgment for $110,994.04 in its favor. All the defendants have appealed.

The underlying facts found by the court and set forth in the memorandum of decision and the record are as follows. The plaintiff, Superior Wire and

Paper Products (hereinafter Superior) is a Canadian corporation that sells steel rod and wire. The defendant, Talcott Tool and Machine, Inc. (hereinafter Talcott), is a middleman that purchases steel for resale to its customers. Between March, 1974, and December, 1974, Superior sold Talcott more than $1,000,000 worth of steel rod and wire. These goods were sold on invoices requiring payment in thirty days.

At the end of June, 1974, Talcott owed $137,454.17. Concerned about the size of this debt, Superior's president went to Talcott's place of business to have a conversation with the defendant George Roy, an officer of Talcott. Several days later, on July 3, 1974, the defendants George Roy, Alan Roy and Roy Machinery & Sales, Inc., wrote Superior guaranteeing payment for goods ordered by Talcott from Superior. Some time subsequent to the guaranty, Talcott furnished Superior further security in the form of a letter of credit for $200,000 which expired at the end of September. At the time of the letter of credit, Talcott's billings from Superior were $325,000. There were further shipments by Superior after expiration of the letter of credit.

In the fall of 1974, steel prices fell precipitously. By November, Superior had stopped receiving payments from Talcott. In December, Talcott notified Superior that discontent with the quality of Superior's shipments was leading to rejections of Superior's steel by Talcott's customers. Talcott made no further payments to Superior thereafter.

The trial court concluded that the plaintiff had established its claim to the unpaid purchase price, that the defendants had not sustained their burden

of proof on their counterclaim and that the defendant guarantors were liable on their guaranty. Each of these conclusions is challenged on this appeal.

Before we consider the merits of these claims of error, it is well to place the parties' claims into context. As contracts for the sale of goods, these transactions are governed by the provisions of article 2 of the Uniform Commercial Code. General Statutes § 42a-2-102. "Under article 2, the rights and liabilities of the parties are determined, at least in part, by the extent to which the contract has been executed. The buyer's acceptance of goods, despite their alleged nonconformity, is a watershed. After acceptance, the buyer must pay for the goods at the contract rate; General Statutes § 42a-2-607 (1); and bears the burden of establishing their nonconformity. General Statutes § 42a-2-607 (4)." *Stelco Industries, Inc.* v. *Cohen,* 182 Conn. 561, 563–64, 438 A.2d 959 (1980). Acceptance does not, however, constitute a definitive election to waive all claims and defenses with respect to the accepted goods. If the buyer can demonstrate that he has been damaged by the nonconformity of the goods that he has accepted, he is entitled to recover such damages as he can prove. General Statutes §§ 42a-2-607 (3),[1] 42a-2-714.[2] Alternatively, if the buyer can demonstrate that the goods are substantially nonconforming, he is entitled, with some qualifications, to revoke his acceptance and recover the purchase

[1] General Statutes § 42a-2-607 (3) provides, in relevant part: "Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."

[2] "[General Statutes] Sec. 42a-2-714. BUYER'S DAMAGES FOR BREACH IN REGARD TO ACCEPTED GOODS. (1) Where the buyer has accepted goods and given notification as provided in subsection (3) of section

price. General Statutes § 42a-2-608.[3] Whichever route the buyer elects, he is required to give timely notice to the seller within a reasonable time after he discovers or should have discovered the seller's breach. General Statutes §§ 42a-2-607 (3) (a), 42a-2-608 (2).[4]

In the present case, the defendants contest neither the sale and delivery of goods pursuant to contracts of sale, nor the fact of the acceptance of the goods by the corporate defendant. The plain-

42a-2-607 he may . recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

[3] "[General Statutes] Sec. 42a-2-608. REVOCATION OF ACCEPTANCE IN WHOLE OR IN PART. (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

A buyer who justifiably revokes acceptance may be able to claim, in addition, damages measured by cover; § 42a-2-711; or by losses arising out of nondelivery. § 42a-2-712.

[4] Timeliness of notice is a question of fact. It is generally assumed that the right to revoke must ordinarily be exercised more expeditiously than the right to recover damages. See White & Summers, Uniform Commercial Code (2d Ed.) §§ 8-3, 11-10.

tiff's prima facie entitlement to recovery of the purchase price has therefore been established. The defendants can defeat this entitlement only by proving the nonconformity of the accepted goods. General Statutes § 42a-2-607 (4).[5]

With respect to the defendants' counterclaim, the defendants bear an even greater evidentiary burden. If they want to rely on the right conferred by § 42a-2-607 to sue for damages flowing from the acceptance of nonconforming goods, they must show not only that the goods were nonconforming, but that their nonconformity has resulted in measurable damages. Such damages include losses "resulting in the ordinary course of events from the seller's breach"; General Statutes § 42a-2-714 (1); or, more typically, damages measured by "the difference . . . between the value of the goods accepted and the value they would have had if they had been as warranted"; General Statutes § 42a-3-714 (2); augmented, in a proper case, by incidental or consequential damages. General Statutes §§ 42a-2-714 (3), 42a-2-715. Unless the goods delivered were totally worthless, these sections do not authorize recovery by the buyer as damages of the purchase price previously paid to the seller. Compare General Statutes § 42a-2-711 (1). Rather, they contemplate that the buyer will prove an offset to the purchase price; see General Statutes § 42a-2-717; although the offset may, because of consequential losses, if proven, exceed the purchase price in amount. The record appears to indicate no financial claim by the defendants other than one for reimbursement of invoices previously paid, and storage and transportation

---

[5] General Statutes § 42a-2-607 (4) provides: "The burden is on the buyer to establish any breach with respect to the goods accepted."

costs incidental thereto. The defendants' counterclaim therefore does not state a cognizable claim for damages under the provisions of article 2.

Absent a claim for damages, the defendants' counterclaim must rest on whatever right they have to revoke acceptance, pursuant to General Statutes § 42a-2-608. A buyer who justifiably revokes acceptance may recover "so much of the price as has been paid." General Statutes § 42a-2-711 (1). In order to revoke acceptance, however, the buyer must prove more than that the goods were nonconforming. He must show that their "nonconformity *substantially* impairs [their] value to him" (emphasis added) and that they were initially accepted because the buyer reasonably expected the seller to cure any defects or because the buyer could not immediately discover such defects. General Statutes § 42a-2-608 (1). These are the substantive standards against which the defendants' counterclaim must be measured and they highlight the burden[6] that the defendants had in the trial court and have on this appeal.

---

[6] The defendants' burden in the particular circumstances of this case is exacerbated by Talcott's position as middleman between the seller and its own customers. In a sinking market, customers who act with dispatch have the opportunity to reject goods effectively, whether or not the goods are, in whole or in part, conforming. General Statutes § 42a-2-602. Whether such a rejection is wrongful depends upon whether the goods tendered "fail in any respect" to conform to the terms of the contract of sale. General Statutes § 42a-2-601. Inevitable delay in the return of goods up the line makes it likely that the middleman will encounter greater difficulties in attempting a timely rejection and will instead have to rely on his limited right to revoke acceptance, conditioned on his ability to prove a nonconformity that "substantially impairs [the] value [of the goods] to him." General Statutes § 42a-2-608. A middleman like the present corporate defendant may therefore find itself, under the provisions of article 2, accountable to its seller and to its customers in accordance with incongruent standards.

Applying these standards, we must determine whether the trial court erred in its conclusions holding the defendants liable to pay the unpaid purchase price and disallowing their counterclaim to recover payments previously made. We note, first, that under each claim the trial court assigned to the defendants a lesser burden of proof than the statutes required. The court required the plaintiff, in its action to recover the purchase price, to bear the burden of showing the conformity of the accepted deliveries, contrary to General Statutes § 42a-2-607 (4), which assigns to the defendants the burden of proving nonconformity. Furthermore, the court failed to recognize the defendants' burden to demonstrate substantial nonconformity on their counterclaim. General Statutes § 42a-2-608 (1). Obviously, the defendants cannot have been prejudiced by losing their case on standards more lenient than those to which they were entitled. We observe, further, that the defendants' challenges to the conclusions of the trial court are of such a nature that our review is severely limited. The defendants do not claim that they were deprived of a full and fair hearing; they raise no evidentiary claims of error. They ask instead that we overturn the factual findings of the trial court with respect to the conformity of the goods, the timeliness of notice of defects, and the existence of express and implied warranties. We are warranted in overturning the factual findings of the trial court only when such findings are clearly erroneous in light of the evidence and the pleadings in the record as a whole. Practice Book § 3060D; *Stelco Industries, Inc.* v. *Cohen,* 182 Conn. 561, 564, 438 A.2d 759 (1980); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

The crucial finding of the trial court was its determination that the defendants had failed to establish that the goods were in fact defective or nonconforming. The court noted that the original specifications for the goods had been modified, by the consent of the parties, in accordance with General Statutes §§ 42a-2-206 and 42a-2-207. That conclusion is not contested on this appeal. With respect to other claims of nonconformity, including the claims that the wire was rusty, out of round, and of improper chemical composition and/or hardness, reported by the ultimate users of the steel, the court found the evidence to be conflicting and unpersuasive. It is axiomatic that the trier of facts is the judge of the credibility of the witnesses who testify before her. *Swenson* v. *Dittner,* 183 Conn. 289, 293, 439 A.2d 334 (1981); *Steinman* v. *Maier,* 179 Conn. 574, 576, 427 A.2d 828 (1980); *Toffolon* v. *Avon,* 173 Conn. 525, 530, 378 A.2d 580 (1977). It is noteworthy that the evidence of customer complaints was limited to only a part of the unpaid invoices involving only a part of the shipments involved in the claim and the counterclaim. On the issue of conformity, we find the record to support the findings made. See *Gilman* v. *Pedersen,* 182 Conn. 582, 585, 438 A.2d 780 (1981); *Hughes* v. *The Contemporary Mission, Inc.,* 180 Conn. 150, 152, 429 A.2d 827 (1980).

The defendants argue that the terms of the contracts of sale were modified to incorporate certain express and implied warranties. There is no doubt that descriptions on invoices ordinarily constitute express warranties that the goods shipped will conform to the description; see General Statutes § 42a-2-313; but in the present case the invoices themselves contained arguably conflicting descrip-

tions, among which a choice had to be made. Under such circumstances, interpretation of what the parties intended is again a question for the trier of facts. *Monroe Ready Mix Concrete, Inc.* v. *Westcor Development Corporation,* 183 Conn. 348, 351, 439 A.2d 362 (1981); *Otto Contracting Co.* v. *S. Schinella & Son, Inc.,* 179 Conn. 704, 709, 427 A.2d 856 (1980); see also General Statutes § 42a-2-317. The trial court was acting within its province in finding an invoice's statement of detailed chemical analyses more persuasive than its general identification of the steel by a number representing its chemical composition. The defendants similarly failed to establish the existence of implied warranties. They have pointed to no evidence that the steel shipped was not of fair average marketable quality, the standard established for an implied warranty of merchantability by General Statutes § 42a-2-314. They failed to persuade the trial court that the plaintiff knew or had reason to know of the special uses to which the defendants' customers intended to put the steel, and thus have not proven an implied warranty of fitness pursuant to General Statutes § 42a-2-315. On warranty, as on conformity in general, the factual conclusions of the trial court were not clearly erroneous.

Since we find no error in the trial court's determination that the plaintiff seller had fully complied with its contractual obligations, we need not review the trial court's findings that the defendants' notice of alleged defects was not timely. We turn instead to the defendants' final issue on this appeal, the defendants' argument that the trial court was in error in finding enforceable the guaranty of the defendants George Roy, Alan Roy and Roy Machinery & Sales, Inc.

The defendants do not contest their execution of the guaranty.[7] They do not deny that their letter constituted an unconditional continuing guaranty. Cf. *Monroe Ready Mix Concrete, Inc.* v. *Westcor Development Corporation,* supra, 350. They argue, rather, that the guaranty was unenforceable, as a matter of law, for lack of consideration.

The defendants' position is based upon two propositions which although factually accurate are legally insufficient. The plaintiff's president testified that the plaintiff, at the time that it asked for a guaranty, was not threatening to take legal action on the bills that were then outstanding since Talcott was not then in default. The plaintiff's president also testified that the plaintiff did not rely on the guaranty until after the expiration of letters of credit obtained subsequent to the execution of the guaranty.

Even if we were to overlook the modern law of contracts, which makes guaranties enforceable on the basis of reliance; see Restatement (Second), Contracts § 89C (Tent. Ed. 1973);[8] we would have no difficulty in finding consideration to have been bargained for and given in this case. Purchases were made by Talcott after expiration of the letter

---

[7] In a letter which became plaintiff's exhibit W in the trial court, addressed to the plaintiff's president, T. W. Hurwitz, the defendants Roy Machinery & Sales, Inc., George Roy and Alan Roy, wrote: "In accordance with our telephone conversation of today, we wish to confirm that Roy Machinery & Sales, Inc., will guarantee payment of purchases made by Talcott Tool and Machine Inc., from Superior Wire & Paper Prod. Ltd. In addition, my brother and I will personally guarantee payments to Superior Wire & Paper Prod. Ltd. We hope that this will be of help to you."

[8] Restatement (Second), Contracts § 89C (Tent. Ed. 1973) provides: "GUARANTY. A promise to be surety for the performance of a contractual obligation, made to the obligee, is binding if (a) the promise is in writing and signed by the promisor and recites a pur-

of credit, at a time when action pursuant to the guaranty, which was continuing and unrevoked, was entirely appropriate. It is clear that the defendants contemplated that their letter of guaranty would induce further shipments by the plaintiff to Talcott. Whether these shipments were made contemporaneously with the execution of the letter of guaranty or at some time thereafter is legally irrelevant to the issue of inducement. The cases relied upon by the defendants, *Fisher* v. *Jackson,* 142 Conn. 734, 118 A.2d 316 (1955), and *Savings Bank of Rockville* v. *Cohn,* 116 Conn. 480, 165 A. 607 (1933), are therefore distinguishable. See *Rice* v. *Almy,* 32 Conn. 297, 303–305 (1864); see generally 1 Corbin, Contracts § 76 (1963); 1A Corbin, Contracts § 206 (1963); 10 Williston, Contracts § 1253 (1967).

There is no error.

In this opinion the other judges concurred.

ported consideration; or (b) the promise is made binding by statute; or (c) the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee or a third person, and the promise does induce such action or forbearance."