[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case involves the claims and cross claims of parties arising from the delivery and installation of damaged freezer cases and dairy cases as part of the renovation of a supermarket in East Haven.
The plaintiff, T J Food Markets, Inc. ("market"), contracted with J. P. Kempf Co., Inc. "("supplier") to supply and install the cases, which were to double its capacity to offer refrigerated goods from approximately thirty feet of cases to approximately sixty feet. The market's claim against the supplier is that the cases are damaged, in violation of an implied warranty of merchantability pursuant to 42a-2-314 C.G.S. The market claims that the supplier is liable for the cost of repairing the damage and consequential loss of the use of the equipment.
The supplier has filed a counterclaim against the market alleging that the market failed to pay the full contract price for the equipment and labor furnished.
The supplier also filed third-party complaints against Friedrich Air Conditioning Refrigeration Company ("manufacturer"), which loaded and shipped the cases from San Antonio, Texas to East Haven, and the two trucking companies that transported the cases to the market, Nationwide Carriers, Inc. and Key Way Transport, Inc. The supplier alleges that the manufacturer was negligent in the manner in which it secured the cases in the trailers in which they were transported, and that as a result of this negligence the cases arrived in a damage( condition. The supplier claims that the manufacturer replaced some but not all damaged parts, that it failed to pay for installation of replacement parts, and that it breached its warranty of merchantability pursuant to 42a-2-314 C.G.S.
The manufacturer has filed a special response alleging that its agreement to supply cases to the supplier was subject to a limited warranty which excludes costs of installation, CT Page 6103 transportation, service, maintenance and consequential damages.
The manufacturer has filed cross claims against the two shippers.
Seven of the twelve cases were shipped on a trailer owned by Nationwide Carriers, Inc. The court has granted motions to dismiss both the supplier's claims and the manufacturer's claims against this defendant because the evidence presented established that the goods were loaded exclusively by agents of the manufacturer and shipped under seal.
The other carrier, Key Way Transport, Inc., which transported the remaining five cases, failed to appear and a default was entered against this party as to the claims of the supplier and the manufacturer. Though a default establishes the factual allegations of the pleading, Costello v. Hartford Institute of Accounting, Inc., 193 Conn. 160, 161 n. 1 (1984), the court finds that the supplier and manufacturer failed to prove that any negligence of the carrier proximately caused the damage to the cases. Where a default is entered on an unliquidated claim, the plaintiff must establish the extent of the damage; caused by the conduct alleged. Mechanics Savings Bank v. Tucker178 Conn. 640, 644 (1979); United National Indemnity Co. v. Zullo, 143 Conn. 124, 130 (1956). Key Way Transport, Inc., like Nationwide Carriers, Inc., transported the cases under seal and did not participate in their loading.
As to the remaining claims, the court finds the facts to be as follows. The plaintiff has operated a market in East Haven since 1971. In the fall of 1987, the market began an expansion project, and in February 1988 it contracted with the supplier to provide and install, among other things, six new dairy cases and six new frozen food cases, pursuant to an oral agreement. The supplier ordered the cases from the manufacturer, which loaded them into two trailer trucks. When the shipments arrived at the market on April 18, 1988, and were opened in front of representatives of the supplier, the trailers contained broken glass, and the cases and the packing materials showed signs of having become loose such that they crashed into each other and parts of the trailer during shipment. The court finds that the manufacturer used packing materials and bracing methods that were insufficient to protect the cases from being damaged en route. The court notes that the person identified as having supervised the loading is still employed by the manufacturer, however he was not CT Page 6104 presented as a witness. The court therefore makes the inference that he would not have refuted the claim of negligent packing of the cases.
When the supplier inspected the twelve cases, it concluded that all bore some damage, such as broken light fixtures and detached coils, and it contacted the manufacturer's representative in Connecticut, Fred Perillo, with whom it had placed the order for the cases. Perillo obtained from the manufacturer replacements for the parts that Perillo observed to be damaged. These replacement parts were delivered to the market while the twelve cases were still on a storage trailer waiting for the construction to progress to a point at which they could be installed. When the market's renovations progressed to that point in early May, the supplier unloaded the cases from the storage trailer and found more damage as it tried to line the cases up so that they would stand evenly, such that drainage systems would work properly. At the supplier's request, Mr. Perillo again came and inspected, and after making inquiry of Friedrich stated that the manufacturer had not determined what it would do about the further damage discovered by the supplier, and that no decision would be made until representatives from the factory could come and inspect. Because it had already taken out the market's existing refrigeration cases and because the market needed to operate, the supplier installed all the Friedrich cases in mid-May.
The supplier advised the market that it expected the manufacturer to replace all defective parts.
Friedrich's representatives came to the market a few weeks later, meeting on June 22 with representatives of the market and the supplier. Subsequently, the manufacturer stated that it would send two replacement dairy cases and a frame for a freezer but refused to pay the cost of installing these items in place of the equipment that had already been installed. While the exact date of the arrival of the two replacement cases and freezer frame was not clearly identified, it appears to have been in the fall of 1988, though an invoice was sent on July 14, 1988 (Ex. 4). The manufacturer took the position that it had replaced all damaged parts, that it would not pay for installation, and that it had no duty to do anything further on the basis of its limited warranty for defective merchandise.
By a letter dated November 16, 1988, the supplier CT Page 6105 represented to the manufacturer that the cost of installing the replacement cases was $10,900.00 (Ex. 13).
The supplier advised the market that it would charge $16,800.00 to install the replacement cases and frame (Ex. 2).
The market did not have the funds to pay to install the replacement cases. The supplier refused to install them without payment, and they remained in storage from 1988 to 1991, when the market paid for one of the cases to be installed in a back room, not as a replacement for one of the damaged cases in the store" line-up. The market encountered problems with several of the cases, which filled with frost because of damaged doors that allowed air leakage, and because of misalignments that caused drainage problems. Since the cases are connected in a line for purposes of drainage and refrigeration, damage to one case leads to problems in adjoining cases.
The market refused to pay the supplier the full contract price, which was $71,000.33 plus labor costs for installation. No witness testified as to the total contract price, however, witnesses for both the market and the supplier testified that the market initially withheld $50,000.00 but subsequently paid $22,000.00, such that $28,000.00 remains unpaid.
The court finds that instead of receiving twelve cases that function properly, the market received three cases that were battered and that function poorly, plus nine cases that experience some icing and drainage problems because they are connected to damaged cases. The market also received two replacement cases and a freezer frame which the supplier refused to install unless the market paid additional installation charges. Though the market was aware that some of the cases had arrived in a damaged condition, it relied on the supplier" representations that they would eventually be put in good working order as a result of receipt by the supplier of replacement part from the manufacturer. The plaintiff market, which has made claim only against the supplier, has proved that the goods furnished by the supplier were not the new, undamaged goods contracted for but were damaged and performed less well than they should in that several cases require frequent unloading, defrosting, and reloading because of ill-fitting doors an misalignment caused by damage to several cases.
Claims of Market vs. Supplier and Supplier vs. Market CT Page 6106
The court finds that the supplier breached its contract with the market by failing to provide and install new, undamaged freezers and dairy cases either initially or after representing to the market that if the damaged cases were installed, they would be replaced later.
A party that has not received the performance bargained for is entitled to damages that leave it in the same position as it would have enjoyed if the other party had fully performed O'Hara v. State, 218 Conn. 628, 642 (1991); Brookfield v. Greenridge, Inc., 177 Conn. 527, 537 (1979); Bertozzi v. McCarthy, 164 Conn. 463, 468 (1973). The cost of completion or correction may be used as the proper measure of such damage. id.
The plaintiff takes the position that it is instead entitled to replacement of all twelve cases, even those which Thomas Wenchell, its president, described at trial as working adequately. Because of this formulation of the measure of damages, which the court finds unwarranted, the plaintiff has adduced little evidence as to the measure of damages that the court does find to be applicable. John Kempf testified that in addition to the $10,900.00 cost of installing the two replacement cases and freezer frame supplied by the manufacturer, installation of three replacements would necessitate dismantling and reinstalling the soffit and tile work that surrounds the installed cases, bringing the total cost of repair to $16,800.00.
Additionally, the court finds that as a result of the supplier's breach, the market has incurred labor costs in the amount of $12,120.00 for extra unloading and cleaning of the faulty cases and affected adjoining cases since their installation in May 1988 (202 hours X $12.00 per hour X 5 years). The court also finds that it will cost the market $805.00 to unload, store, and reload the freezer and dairy cases during replacement ($576.00 labor, $229.00 storage rental).
In total, the plaintiff's damages are found to be $29,725.00. While the plaintiff also claims loss of business caused by the malfunctioning cases, it provided absolutely no evidence from which the court could determine, outside the realm of speculation, what such damage might have been. The plaintiff has failed to discharge its burden of presenting evidence that offers a basis for measuring this claimed element of damages, an no such damages can therefore be awarded. Ferri v. Pyramid CT Page 6107 Construction Co., 186 Conn. 682, 691 (1982); Falco v. James Peter Associates, Inc., 165 Conn. 442, 445 (1973); Gerrety Co. v. Palmieri, 11 Conn. App. 226, 230 (1987).
Because the plaintiff has failed to pay the contract price, the supplier has filed a counterclaim for the unpaid balance. The defendant supplier presented in evidence a document which was identified as the statement of the plaintiff's running account; however, this document contains no charge in the amount of the contract price. A charge in the amount of $35,492.82 dated May 31, 1988 is noted as having been paid on July 1, 1988. No witness connected any other billing entry with the contract at issue; however, since the plaintiff's president admitted that $28,000.00 of the contract price remains unpaid, the court finds that the supplier has proved its counterclaim to that extent. The plaintiff also received from the supplier two dairy cases and a freezer frame over and above the goods ordered. Since this equipment merely replaced damaged cases, the supplier is not entitled to a credit for the value of these cases.
Claims of Supplier vs. Manufacturer
The supplier has filed a third-party complaint against the manufacturer in which it claims that the manufacturer was negligent in packing the cases which it ordered to fulfill its contract with the market (Counts 1 and 4), that the manufacturer delivered goods that were not of merchantable quality pursuant to42a-2-314 C.G.S., that the supplier notified the manufacturer of the defect, and that as a result of the defect, the supplier has incurred and will incur costs of repair (Fifth Count). The manufacturer has denied liability and has pleaded as a special defense that the agreement with the supplier was subject to c limited warranty that excluded installation costs and consequential damages.
The court has found that the goods that the supplier ordered from the manufacturerer [manufacturer] to fulfill its contract with the market were damaged as a result of faulty loading for transport by the manufacturer. The items delivered to East Haven were not "defective" in the sense of suffering from a deficiency in manufacture, rather, they were damaged by crashing around in the trailer en route from Texas to Connecticut. The supplier paid in full for the twelve cases before they were shipped.
Larry Klekar, who was employed by the manufacturer as its CT Page 6108 director of sales and marketing in 1988, testified that, whatever its policy as to claims of defective merchandise, it was the policy of the manufacturer to replace at no cost all goods it shipped that arrived in a damaged condition, and to either retrieve or scrap the damaged goods on site (Dep. p. 27).
The manufacturer had a duty to fulfill the order it accepted from the supplier by furnishing twelve undamaged refrigerator cases to the market in East Haven. Under the circumstances proven, the seller of the goods bore the risk of damage or loss to the point of delivery, pursuant to 42a-2-509 C.G.S.
Section 4a-2-508(1) C.G.S. provides that where, as in this case, nonconforming goods are tendered, the seller may seasonably notify the buyer of its intention to cure and "may then within the contract time make a conforming delivery." The evidence did not reveal any date by which the manufacturer agreed to deliver the refrigeration cases ordered by the supplier. Accordingly, pursuant to 42a-2-508(2) C.G.S., the seller was entitled to "reasonable time to substitute a conforming tender." The manufacturer was immediately notified that the goods it had delivered were nonconforming, that is, that they were damaged, however it equivocated with regard to substituting conforming goods. It did not ship new cases but provided replacements for only some of the damaged parts, leaving unresolved the issue of damaged frames and canopies. When, upon further inspection in early May, the supplier reported the discovery of further substantial damage, the manufacturer did not ship or promise to ship conforming goods but waited several weeks, until June 22, 1988, before sending representatives from Texas to inspect the damaged cases. By that time, the market's renovations had progressed to the point that the new cases had had to be installed in order for the market to remain open and not lose its customers. In fact, the manufacturer did not supply replacements for the cases and frame it acknowledged were damaged until the fall of 1988, approximately six months after the nonconforming delivery.
In the context of refrigeration cases for the remodelling of a market, the manufacturer's delay in supplying conforming goods cannot be construed to be reasonable.
The supplier, however, must be seen as having accepted the nonconforming goods by installing them. It is, nevertheless, entitled, pursuant to 42a-2-607(3) and 42a-2-714 C.G.S., to CT Page 6109 recover for "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Superior Wire and Paper Products, Ltd. v. Talcott Tool Machine, Inc., 184 Conn. 10, 13 (1981); Sun Hill Industries, Inc. v. Kraftsman Group, Inc., 27 Conn. App. 688,695, cert. den. 223 Conn. 913 (1992). The court finds that under the circumstances found, the supplier is entitled to recover the losses it incurred because the provision of nonconforming goods caused it to breach its contract with the market, that is, the damages awarded as to the market's claim ($29,725.00), less the offset amount the defendant has been awarded as to its counterclaim ($28,000.00), or $1,725.00. In addition, the supplier proved that its costs in installing the twelve refrigeration cases were substantially increased because it had( to remove damaged parts, install replacement parts, and perform extra efforts to try to make the goods supplied useable. The supplier produced records that established that it incurred costs in this regard of $7,335.00.
The supplier also seeks an award of attorney's fees incurred in the defense of the market's action against it, on the theory that it is entitled to be indemnified because it was exposed to liability because of the failure of the manufacturer to comply in timely fashion with its own policy of replacing damaged parts The supplier relies on Seismograph Service (England, Limited v. Bolt Associates, Inc. 8 Conn. App. 446, 453 (1986), in which the Appellate Court reversed the ruling of the trial court, which had denied counsel fees to a seller of a product who was sued by his customer and who sought counsel fees on a theory of indemnification from a third party that had furnished a defective part use as a component of the machinery produced by the seller.
The court in Seismograph, citing a ruling by Justice Shea in Sendroff v. Food Mart of Connecticut, Inc., 34 Conn. Sup. 624
(1977), stated that "[t]he implied contract of indemnity which arises in favor of a person who is exposed to liability on account of the tortious act of another imposes an obligation upon the actual wrongdoer to reimburse the indemnifier not only for any damages which he has been obliged to pay but also for reasonable attorney's fees, at least where he has notice of the suit against the indemnifier and an opportunity to defend." Seismograph, supra, at 453.
The manufacturer does not dispute that it was given notice of the market's claim that the cases were worth less than the CT Page 6110 contract price because they had been damaged in transit. Rather than requesting leave to take on the supplier' defense, see42a-2-607(5) C.G.S., the manufacturer took the position that it had no liability to the supplier because its liability for breach of warranty was limited.
The court finds that the supplier is entitled to recover its reasonable counsel fees incurred in defending against the claim by the market. The supplier has not, however, identified any theory for recovery of counsel fees as to its own claim against the manufacturer. The court has therefore inspected the fee affidavit of counsel in conjunction with the pleadings and the observed efforts of counsel for the supplier at trial, in which it virtually did not oppose the plaintiff's evidence. Upon this inspection, the court finds that the supplier, J. P. Kempf Co., Inc., incurred counsel fees in the amount of $12,765.25 in the defense of the plaintiff's claim against it, and that the manufacturer is liable to the supplier in that additional amount.
In all, the supplier shall recover from the manufacturer the sum of $21,825.25.
Conclusion
Judgment shall enter in favor of the plaintiff, T J Food Markets, Inc., against the defendant, J. P. Kempf Company, Inc. in the amount of $29,725.00. On the counterclaim, judgment shall enter in favor of J. P. Kempf Company in the amount of $28,000.00. The plaintiff shall recover its court costs.
Judgment shall enter in favor of the third party plaintiff, J. P. Kempf Company, against defendant Friedrich Air Conditioning and Refrigeration Company in the amount of $21,825.25. The third party plaintiff shall recover its court costs as to the third party complaint.
Judgment shall enter in favor of the third-party defendant, Nationwide Carriers, Inc., as to the claims of J. P. Kempf Company and Friedrich Air Conditioning and Refrigeration Company.
Judgment shall enter in favor of Friedrich Air Conditioning and Refrigeration Company against Key Way Transport Inc., however, only nominal damages, in the amount of one dollar, are awarded. CT Page 6111
Beverly J. Hodgson, Judge