[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTS
In July of 1991, the plaintiff agreed to purchase from the defendant an overstock of household cabinets at a discount price. These items were to be first quality and in factory fresh cartons. The negotiations were conducted by Joseph Berrelli, an employee of the defendant.
Between July 9 and September 23, over 3,000 cartons were received at five of the plaintiff's stores. The plaintiff paid the defendant in full the sum of $109,922.80.
When some of the cartons were opened preparatory to the units' being placed on sale, various defects and damage were detected, prompting the plaintiff's merchandise manager to contact Mr. Berrelli. Mr. Berrelli visited one of the plaintiff's locations in September or October, 1991 and examined a group of cabinets with various shortcomings. Mr. Berrelli contacted a representative of the defendant who was to contact a factory representative and "work it out". The plaintiff was advised it could be contacted and though agents of the defendant visited the plaintiff a couple of times and "promised to take care of everything", nothing was done to address the plaintiff's complaints.
The plaintiff has sold only a quarter of the units and claims to have had many items returned by customers who cited defects and missing parts. In addition, the plaintiff has spent sums advertising these units and because of their poor sales performance, the defective units and the remaining stock are occupying valuable space in the plaintiff's various locations.
The plaintiff has brought a five count complaint, alleging breach of contract, failure to arrange for return of the cabinets, breach of warranty, and CUTPA violations.
The defendant has denied the plaintiff's allegations and interposed a special defense alleging the plaintiff purchased the items in an "as is" condition and that the goods were accepted and no repudiation was made within a reasonable time.
 I.
A. The first special defense of the defendant must be rejected, as the sales documents, Exhibits A B and the testimony CT Page 4265 of Mr. Berrelli all refer to "first quality" merchandise and "factory fresh" cartons. Even James Gerrity, the president of the defendant company, stated that this was "new stock".
B. As for the defense that the plaintiff did not repudiate the transaction within a reasonable time, the plaintiff relies on § 42a-2-608(1) of the Uniform Commercial Code. This section states:
 Sec. 42a-608. Revocation of acceptance in whole or in part. (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
The plaintiff presented evidence that it had received assurances that the problems complained of would be addressed. Consequently, it continued to advertise the cabinets and attempted to sell them. When more returned merchandise collected and additional defects were discovered, and the defendant still took no corrective action, the plaintiff wrote the defendant, offered to return all remaining units and asked for a full refund (Exhibit E, June 14, 1992).
An examination of the correspondence between the parties in 1992 compels the conclusion that Mr. Berrelli's concerns, after he made a visit to one of the plaintiff's locations, were not addressed by the defendant until 1992. By that time almost a year had elapsed. It wasn't until August 18, 1992 that the defendant denied any liability to the plaintiff.
While the defendant argues that the defects and damage were minimal and repudiation was late, it presented no evidence to rebut the testimony of Mr. Berrelli, its former employee, as to what he expected the defendant to do in 1991 when he examined damaged goods at one location.
In fact, the defendant mis-characterizes the plaintiff's evidence as to the extent of the defects and damage as comprising CT Page 4266 only the 12 or so cartons examined by Mr. Berrelli at one of the plaintiff's locations. There was testimony that each location had collected defective cabinets and that exchanges and refunds had become recurring problems.
The former president of the defendant who testified at trial had no first hand knowledge of the problems complained of, didn't recall speaking to Mr. Berrelli about his visit and admitted he might not have been told of the extent of the plaintiff's complaints.
Finally, the correspondence from the defendant in evidence is all in 1992. In June, the defendant's general manager reports a visit by representatives of the defendant and the manufacturer to the plaintiff's premises. A July letter to the plaintiff from the defendant's president fails to mention this visit or its result, but rather seems to suggest the plaintiff shouldn't complain as he got a good deal! An August letter seems to admit damage but blames it on the plaintiff's employees. Then, on August 18, 1992 the defendant's general manager issued a denial of any liability. There isn't a word about de-lamination and there are repeated suggestions in this correspondence that this amount of defective merchandise is "par for the course." There is no statement as to what the June 1992 inspection revealed but the defendant repeats its assertion that the merchandise was "first quality."
It is the conclusion of the court that the merchandise received by the plaintiff did not conform to the contract, that discovery of the non compliance was difficult because of the nature of the goods, the volume, and the types of defects and finally that the plaintiff relied on the defendant to cure the nonconformity. All of this combined to cause the repudiation by the plaintiff to be delayed. Implicit in this conclusion is the finding that the defendant breached its contract with the plaintiff by providing damaged and defective cabinets with parts missing and by neglecting to take corrective action within a reasonable time.
Our Supreme Court addressed a similar situation in SuperiorWire Paper Products, Ltd. v. Talcott Tool Mach., Inc.,184 Conn. 10 (1981). At page 16, the court noted:
 "A buyer who justifiably revokes acceptance may recover `so much of the price as has been paid.' General Statutes § 42a-2-711(1). In order to revoke acceptance, however, the buyer CT Page 4267 must prove more than that the good s were nonconforming. He must show that their `nonconformity substantially impairs [their] value to him' (emphasis added) and that they were initially accepted because the buyer reasonably expected the seller to cure any defects or because the buyer could not immediately discover such defects. General Statutes § 52a-2-608(1)."
Thus, the plaintiff is entitled to recover that portion of the purchase price allocated to the stock on hand, $75,000, the court having concluded that it has minimal value and is not suitable for uses in the manner for which it was purchased.
 II.
The plaintiff also seeks to recover its advertising costs incurred in promoting the sale of the se cabinets as well as its storage costs. On this latter point, the plaintiff argues it could have put all the square footage in its various locations to productive use but for having to retain this stock while awaiting the defendant's decision.
A. The plaintiff's merchandise manager testified that from $15,000 to $30,000 was spent advertising this merchandise. Unfortunately, that represents a sizeable spread when one must assess damages. The court will accept the figure of $20,000 as attributable to the sales promotions of these cabinets. Since the sale of about 25% of the items occurred, the sum of $5,000 must be deducted from the total, leaving a balance of $15,000 as the plaintiff's loss in advertising the remaining merchandise presently unsold.
B. The plaintiff also claims damages for the loss of warehouse and storage space which had to be devoted to the storage of this merchandise and continues to be utilized for that purpose. The plaintiff relates that 5,000 square feet of storage space has been tied up. He argues it is worth four dollars a square foot and can produce $70 to $80 a square foot. With the fourth anniversary of the transaction approaching, the plaintiff computes his loss as 5,000 square feet at $4 per square foot or $20,000 a year for four years.
Section 42a-2-715 defines the incidental damages which are CT Page 4268 claimed here as:
 (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commission in connection with effecting cover and any other reasonable expense incident to the delay or other breach. (emphasis added).
At the time the plaintiff issued its repudiation or revocation of acceptance, June 15, 1992, the plaintiff became a bailee for the defendant. Modern Home Utilities, Inc. v. Gerrity, 121 Conn. 651,655 (1936). As such, it was obligated to care for and preserve the property, lest the defendant suffer the loss of its non-accepted merchandise. This would also prevent the plaintiff becoming unjustly enriched by retaining the property.
The court finds the revocation occurred on June 15, 1992 and not sooner because up to that time, the parties were in contact and discussions were taking place which could still have resolved the problem.
The court finds however that the plaintiff's claim for four years at $20,000 a year is too high. It contemplates a full return for the entire period of the total use of the 5,000 square feet for a business that is not engaged in a warehousing operation.
A more reasonable and equitable computation would be the sum of $40,000 covering the period of June 1992 through June of 1996, with this latter date allowing for a period of time within which the defendant would arrange to remove the merchandise, consistent with this decision.
 III.
The plaintiff also seeks to recover under CUTPA, alleging that the defendant's failure to attempt to remedy the claimed defects "despite its assurances to the plaintiff that it would do so" was deceptive, unethical, unscrupulous, immoral and unfair." The defendant's response to the CUTPA claim is that the defendant's actions did not constitute fraud. The court agrees with that statement, but finds that the defendant's apparent indifference to CT Page 4269 the problem was at least deceptive and unfair, causing the plaintiff to incur additional expenses and expend further effort in the attempt to sell this merchandise, creating what can be characterized as an insoluble mess.
The defendant's reiteration of its claim that only twelve cartons were involved out of 3,000 is misleading. The plaintiff's evidence of its grievances was more substantial then that, yet the defendant produced no one who was familiar with the problem or who could explain the defendant's position. For example, after taking no affirmative action though promising to do so, the defendant asserts the plaintiff waited too long to complain! When confronted with claims of substantial numbers of defective cabinets, the response was that the numbers weren't so bad and — you got a good deal to start with!
The court finds a CUTPA violation on the part of the defendant with respect to its failure to attempt remedial action despite assurances it would do so. On the CUTPA count, the court awards the plaintiff's counsel fees in the amount of $10,000.00.
CONCLUSION
Judgment may enter for the plaintiff to recover of the defendant the total sum of $140,000.00, representing $75,000 for prior payment of the unsold units, $15,000 for advertising losses, $40,000 for warehouse space, and $10,000 for counsel fees.
The plaintiff is entitled to its taxable costs.
Anthony V. DeMayo State Trial Referee