******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# NORTHEAST BUILDERS SUPPLY & HOME CENTERS, LLC *v.* RMM CONSULTING, LLC, ET AL.
## (AC 41486)

Keller, Prescott and Devlin, Js.

*Syllabus*

The plaintiff, a building supply company, sought to recover damages from the defendants for breach of contract after they failed to make payments owed for building materials sold to them pursuant to a credit agreement. The credit agreement was signed by the defendant M, who was the sole member of the defendants R Co. and T Co., and by the defendant J, M's husband and a building contractor, in their capacities as both buyers and personal guarantors. The defendants filed a five count counterclaim and the plaintiff moved to strike four of the counts on the ground that they did not arise out of the same transaction that formed the basis for the plaintiff's complaint. The trial court granted the motion to strike and later rendered judgment in favor of the plaintiff on the four stricken counts. Following a trial to the court, the trial court rendered judgment for the plaintiff on its complaint and on the remaining count of the counterclaim alleging breach of contract, from which the defendants appealed to this court. *Held*:

1. The trial court did not abuse its discretion in granting the plaintiff's motion to strike four counts of the defendants' counterclaim because the counts did not arise out of the same transaction that formed the basis for the complaint: the stricken counts involved issues relating to the plaintiff's use of prejudgment remedies, the propriety of the prejudgment remedies, and their legal effect, and the plaintiff's motivation in utilizing such remedies presented factual and legal issues distinct from those necessary to adjudicate whether the defendants breached the credit agreement; accordingly, the court should have rendered judgment dismissing the counts on the ground of improper joinder, and the case was remanded with direction to render a judgment of dismissal with respect to the stricken counts of the counterclaim.

2. The trial court properly rendered judgment on the merits of the complaint and the counterclaim in favor of the plaintiff:

   a. The trial court's finding that the plaintiff was the seller of the building supplies at issue in the complaint was not clearly erroneous: the defendants failed to provide any basis for this court to conclude that the court erred in viewing an uncontested allegation in the defendants' surviving count of its counterclaim as a judicial admission that the plaintiff was the seller; moreover, even if the court should not have treated the defendants' pleadings as constituting a judicial admission, there was sufficient evidence in the record to support the court's finding that the plaintiff was the seller, including the fact that the credit application identified the plaintiff as the party extending the credit, invoices provided to the defendants had the plaintiff's name and logo printed on them and indicated that payment should be remitted to the plaintiff, all funds paid by the defendants were deposited into accounts owned by the plaintiff, and the plaintiff was the actual owner of the materials provided to the defendants.

   b. The trial court's finding that J and M acted in dual capacities as buyers and guarantors was not clearly erroneous; the court was entitled to rely on the defendants' allegation in the surviving count of its counterclaim that the defendants collectively, including J and M, purchased goods and materials from the plaintiff as a judicial admission that J and M were buyers under the credit agreement.

   c. Contrary to the defendants' claim, the trial court applied the proper standard in considering the defendants' defense of revocation; the court found that the defendants had failed to present evidence that established to what extent any defects in the building materials had impaired the value of the goods delivered to the defendants, which was a necessary element to justify revocation of acceptance.

d. The defendants' claim that the trial court misapplied a provision (§ 42a-2-714) of the Uniform Commercial Code in rendering judgment for the plaintiff on the breach of contract count of their counterclaim was unavailing; although the court found that the defendants had shown that some of the goods may have been nonconforming, the defendants failed to establish the value of the goods as accepted, which prevented the court from comparing the value of the goods as received to the value of the goods had they been received in proper condition.

e. The trial court's award of damages to the plaintiff was not clearly erroneous; there was evidence before the court from which it could make a fair and reasonable calculation of the amount of damages, including copies of statements that accounted for all charges and payments from the time the defendants opened the credit account through the filing of the action and it was free not to credit the evidence submitted by the defendants in support of their challenges to the damages claimed by the plaintiff.

Argued June 15, 2020—officially released January 26, 2021

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Radcliffe, J.*, granted the plaintiff's motion to strike certain counts of the defendants' counterclaim and rendered judgment thereon; thereafter, the matter was tried to the court, *Arnold, J.*; judgment for the plaintiff on the complaint and the counterclaim, from which the defendants appealed to this court. *Improper form of judgment*; *affirmed in part*; *reversed in part*; *judgment directed.*

*Irve J. Goldman*, with whom was *Bruce W. Diamond*, for the appellants (defendants).

*Bruce L. Elstein*, for the appellee (plaintiff).

*Opinion*

PRESCOTT, J. The action underlying this appeal involves a dispute over payment for building supplies provided by the plaintiff, Northeast Builders Supply & Home Center, LLC, to the defendants, RMM Consulting, LLC (RMM); Todd Hill Properties, LLC (Todd Hill Properties); Maureen Morrill; and Clifford Jones. The defendants appeal, following a trial to the court, from the judgment rendered in favor of the plaintiff on its one count breach of contract complaint and from the court's earlier partial judgment rendered against the defendants on several counts of their counterclaim following the granting of a motion to strike those counts.[1]

On appeal, the defendants claim that the court improperly (1) granted the plaintiff's motion to strike four counts of their counterclaim on the ground that the counts were improperly joined because they failed the transaction test set forth in Practice Book § 10-10,[2] and (2) rendered judgment in favor of the plaintiff on its complaint and on the sole remaining count of the counterclaim because the court (a) incorrectly determined that the plaintiff was the seller of the goods at issue, (b) wrongly concluded that the individual defendants, Jones and Morrill, were liable as buyers of the goods rather than as guarantors only, (c) failed to properly consider the defendants' defense of revocation of acceptance, (d) rendered judgment for the plaintiff despite having found that some of the goods at issue were defective and that the plaintiff had refused to remedy or replace them, and (e) incorrectly found that the plaintiff proved its damages to a reasonable degree of certainty.[3] We conclude that the court properly granted the motion to strike, but that the form of the judgment rendered on the stricken counts of the counterclaim was incorrect, and, accordingly, we reverse the judgment on the stricken counts of the counterclaim and remand with direction to render a judgment of dismissal on those counts. We otherwise affirm the judgment of the court.

The record reveals the following facts and procedural history relevant to our review of the claims on appeal.[4] In September, 2006, the defendants executed a credit application form (agreement) provided to them by an employee of the plaintiff for the purpose of establishing a $100,000 open line of credit with the plaintiff in the names of the defendants RMM and Todd Hill Properties. The agreement was approved and signed by the plaintiff on September 26, 2006.

The "general terms and conditions" section of the agreement provides in relevant part that, in exchange for the extension of credit by the "[s]eller," the "[b]uyer" agrees to make payments in accordance with the terms specified in the agreement.[5] The agreement expressly defines the term "[s]eller" as including "[the plaintiff],

*its subsidiaries*, divisions, or its assigns and Divisions: Bridgeport 'Do It Best' Lumber, Weed & Duryea Lumber and Home Center, and The Kitchen & Home Planning Center . . . ."[6] (Emphasis added.) The term "[b]uyer" is defined in the agreement as including "any member of the business entity" seeking credit. In addition to agreeing to make all required payments, the buyer agreed that, if legal action was needed to enforce payment, "the [b]uyer will be responsible for all reasonable costs and expenses of collection, including [attorney's] fees and court costs . . . ." As a condition of approval by the plaintiff, the agreement required that a "[p]ersonal [g]uarantor or [i]ndividual [b]uyer" sign the agreement to ensure an "unlimited guaranty of payment and a primary and unconditional obligation intending to cover all existing and future indebtedness of the [b]uyer to the [s]eller including but not limited to payment of interest and attorney's fees and costs due upon default as provided above and including an[y] indebtedness in excess of the credit limit approved."

Morrill, who was the sole member of both RMM and Todd Hill Properties, signed the agreement in two places—once on a line designated for the buyer and, again, on a separate line marked "Personal Guarantor (2nd/Spouse)." Jones, who is Morrill's husband and a building contractor, signed on a line marked "Personal Guarantor or Individual Buyer."

Soon after establishing their line of credit with the plaintiff, the defendants began to purchase and receive various building materials from the plaintiff for use in several construction projects, including a project converting a property located at 11 Cornwall Road from a multifamily residence into a bed and breakfast.[7] The plaintiff provided the defendants with invoices for all materials purchased and also provided regular monthly statements for the credit account, which included any outstanding balances due.[8] Beginning in June, 2008, the defendants failed to make payments when they were due, and, by the end of July, 2008, the defendants' account had fallen into arrears.

The plaintiff commenced the underlying action on December 31, 2008. In its one count complaint, the plaintiff alleged that the defendants had failed to pay amounts due and owing to it under the parties' agreement, despite its demands for payment. According to the complaint, the balance due and owing on the defendants' credit account was $68,886.58, plus interest. The plaintiff also alleged that it was entitled to recover attorney's fees that it incurred in seeking to collect payment. Together with the complaint, the plaintiff served the defendants with notice of an ex parte prejudgment remedy in accordance with General Statutes § 52-278f.[9]

The defendants filed their initial answer to the complaint in April, 2009. In that answer, the defendants admitted "that they purchased some items from the

plaintiff" but denied that they had done so at any agreed upon price or that they had failed to make required payments. The initial answer included four special defenses and a two count counterclaim directed against the plaintiff. The counts of the counterclaim sounded in breach of contract and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

In June, 2010, the plaintiff filed notice with the court that Morrill had filed a Chapter 11 bankruptcy petition in March, 2010. This resulted in a stay of further proceedings in the underlying action until July, 2015, at which time the Bankruptcy Court, with the consent of the parties, granted relief from the automatic bankruptcy stay to allow the parties "to proceed with the state court action to conclusion."

On September 2, 2015, the defendants filed an amended answer, special defenses, and counterclaim. In the amended answer, the defendants no longer admitted to having purchased items from the plaintiff, leaving the plaintiff to its proof on that allegation. The defendants also added a fifth special defense in which they asserted that they had not purchased any of the goods and materials referenced in the complaint from the plaintiff and that any such items were supplied by and purchased from the plaintiff's subsidiary, Northwest Lumber and Hardware (Northwest Lumber). The defendants also added two new counts to the counterclaim. Counts one and two continued to sound, respectively, in breach of contract based on the defendants' alleged receipt of defective materials and a CUTPA violation. The third count challenged, inter alia, whether the agreement was "an effective obligation or guarantee of debts incurred as a result of goods and materials sold and delivered by Northwest [Lumber]."[10] The fourth count sought to recover damages that had arisen because of the plaintiff's allegedly improper use of prejudgment remedies in this matter.

The plaintiff filed a motion to strike the amended counterclaim, arguing that the defendants had failed to join Northwest Lumber as a party despite the allegations that suggested that Northwest Lumber was the proper party plaintiff and counterclaim defendant, and that the allegations of damages arising as a result of prejudgment attachments were insufficient to state any cause of action upon which the court could grant relief. The defendants filed an objection. The court, *Radcliffe, J.*, issued an order granting the motion to strike as to counts two and four of the counterclaim without prejudice to the defendants' refiling within fifteen days. As part of that order, the court also stated: "The court makes a further finding that there is only one counterclaim defendant, which is the [plaintiff] and there is no other party to the counterclaim."

The defendants timely amended their counterclaim

for a second time on March 8, 2016. Count one of the counterclaim, which they labeled as "breach of contract/reasonable reliance," and count three, which remained unidentified as to the cause of action it purported to allege, were essentially unchanged. Count two contained several new factual allegations and was labeled by the defendants as asserting a cause of action for "abuse of process/CUTPA." The defendants also made changes to count four, which purportedly now asserted a cause of action for slander of title resulting from the prejudgment remedies of attachment pursued by the plaintiff in conjunction with this action.

In response to the second amended counterclaim, the plaintiff filed an extensive request to revise, to which the defendants objected. On May 17, 2016, the court, *Hon. George N. Thim*, judge trial referee, issued an order overruling the defendants' objections with respect to the requested revisions except for a couple of objections with respect to which the court agreed with the defendants that the plaintiff improperly sought the disclosure of evidentiary materials.

Following the court's order, the defendants filed a revised counterclaim on June 22, 2016, which is the operative counterclaim at issue in this appeal. The first count of the counterclaim continued to allege breach of contract by the plaintiff. The second count of the counterclaim, which previously had asserted both abuse of process and a violation of CUTPA, now sounded in abuse of process only. The defendants moved the CUTPA allegations to a new fifth count. Significantly, the defendants revised the opening paragraphs of their first and second counts to now allege that the defendants collectively had "purchased a sundry of materials and goods *from* [*the plaintiff*]." (Emphasis added.) The third count, however, did not incorporate this revised allegation but, instead, asserted in its opening paragraph that the allegations in the plaintiff's complaint "[arise] out of goods and materials sold and delivered by [Northwest Lumber], not [the plaintiff], to [RMM] . . . and/or the other [defendants]." Count four alleged slander of title resulting from prejudgment remedy liens of attachment, and, as already indicated, count five alleged a CUTPA violation.[11]

On June 24, 2016, the plaintiff filed a motion to strike all but the first count of the counterclaim, arguing that the remaining four counts did "not arise out of the transactions that are the basis of the plaintiff's complaint and, therefore, must be stricken." The plaintiff also filed a memorandum in support of its motion to strike. The defendants filed an objection to the motion to strike, stating as grounds for their objection that the challenged counts "are *legally sufficient* in that they *properly set forth causes of action*." (Emphasis added.) They simultaneously filed a memorandum of law in support of their objection to the motion to strike.

On August 8, 2016, following a hearing, Judge Radcliffe issued an order granting the plaintiff's motion to strike all the challenged counts of the revised counterclaim.[12] On September 22, 2016, the court, pursuant to a motion for judgment filed by the plaintiff, rendered judgment in favor of the plaintiff on the four stricken counts of the counterclaim. The plaintiff thereafter filed an answer and special defenses to the defendants' sole remaining count, in which they admitted the allegation contained in the first and only remaining count of the counterclaim that "[the defendants] purchased a sundry of materials and goods from [the plaintiff]."

The matter was assigned for a court trial before Judge Arnold. The court heard evidence over nine days beginning on September 22, 2016, and concluding on January 26, 2017. The court heard testimony from multiple witnesses and received well over 140 exhibits. The parties each filed posttrial briefs and reply briefs. On February 2, 2018, the court issued its memorandum of decision finding in favor of the plaintiff on the complaint and the counterclaim.

In its decision, the court first addressed the defendants' arguments regarding the identity of the seller of the materials for which payment was sought. The court noted that if, as argued by the defendants, Northwest Lumber was the actual seller rather than the plaintiff, "the issue becomes one of standing as it pertains to the [plaintiff's] ability to prosecute this action." The court rejected the defendants' arguments. It found that the plaintiff was the seller of the goods at issue and, accordingly, that it had standing to seek payment from the defendants pursuant to the agreement. The court based its decision on its review of the evidence presented at trial, which, on balance, the court concluded, demonstrated that the defendants both knew and acknowledged that the plaintiff was the seller.[13] The court also relied in part on Judge Radcliffe's earlier ruling that the plaintiff was the only counterclaim defendant and that "there is no other party to the counterclaim," concluding that this finding was the law of the case. The court further treated the allegations that the defendants had made in their various withdrawn, amended, or superseded pleadings indicating that the plaintiff was the seller of the building materials at issue as constituting evidentiary admissions that the plaintiff "and no one else" was the seller.

The court next turned to the merits of the parties' competing breach of contract claims. As identified by the court, the plaintiff sought damages of $128,294.75, which consisted of principal and interest owed for the building materials that it provided to the defendants pursuant to the agreement. The defendants, on the other hand, claimed by way of defense and counterclaim that, inter alia, a substantial portion of the building materials at issue were nonconforming or otherwise defective

and, therefore, they either had no obligation to pay the plaintiff for the materials or were entitled to consequential damages resulting from the plaintiff's refusal to repair or to replace the defective materials.[14]

In resolving the parties' claims, the court first recognized that the case had been improperly tried and briefed by the parties as a "simple debt collection action based on a simple common-law breach of contract" rather than as a commercial contract for the sale of goods governed by the provisions of article 2 of the Uniform Commercial Code (UCC), General Statutes § 42a-2-101 et seq. After citing relevant provisions of the UCC and discussing the evidence presented at trial, the court ultimately concluded that the plaintiff had established the allegations in the complaint and that it was owed the balance on the account, plus interest, as alleged. The court also ruled for the plaintiff on the defendants' counterclaim. Although the court found that some of the materials provided by the plaintiff had been nonconforming or defective, it nevertheless concluded: "The court agrees with the plaintiff that the defendants did not plead that the goods had a different value in its counterclaim. They presented no evidence on the difference in value of the materials. They presented no evidence of any actual amounts spent to fix or repair any claimed defective goods that were measurable at the time of trial. Proof was submitted as to the claimed cost to repair, but no award can be based upon that as no defendant any longer owns such property or is under any obligation to make any such repair. The properties in question have either been foreclosed upon or sold. . . .

"The court enters a verdict for the plaintiff on its complaint and finds that the plaintiff has established that the balance on the account due and owing to the plaintiff by the defendants at the time of the complaint was $68,886.58, plus interest on that principal debt. The court enters a verdict for the plaintiff on the defendants' counterclaim, and as such there is no offset to the plaintiff's claim of the balance due and owing by the defendants." (Footnote omitted.) The court further indicated that it would schedule a postverdict hearing to determine "if the court would award attorney's fees and costs to the plaintiff and, if so, what amounts may be reasonable."[15] The court later denied the defendants' motion to reargue, and this appeal followed.

As previously indicated; see footnote 12 of this opinion; after filing this appeal, the defendants filed a motion for articulation. With respect to Judge Arnold's decision on the merits of the complaint and sole remaining count of the counterclaim, the defendants argued that the court had overlooked or failed to decide certain issues properly raised to the court, its decision was ambiguous and in need of clarification, and it failed to set forth sufficient factual or legal bases for its decision. Judge

Arnold denied the portion of the motion for articulation pertaining to his decision without comment.

In response to a motion for review filed by the defendants, however, this court ordered Judge Arnold "(1) to articulate whether [the court] found that [Morrill and Jones] were guarantors or individual buyers of the materials that are the subject of the plaintiff's complaint and, if it found that they were individual buyers, to provide the factual basis for that finding; and, (2) to articulate whether it found that the trim that the plaintiff delivered to 11 Cornwall Road was defective and whether it found that RMM had revoked its acceptance of that trim, as well as the factual and legal basis for the court's finding."

On May 28, 2019, Judge Arnold filed an articulation in response to this court's order. In that articulation, the court indicated that it found that "Morrill and Jones acted in dual capacities as both buyers and guarantors." Although seeming to acknowledge the ambiguity in its original memorandum of decision, in which the court had indicated that Morrill and Jones had signed the agreement as "personal guarantors *and/or* individual buyers" (emphasis added), the court nonetheless explained that, in the sole remaining count of the counterclaim, the defendants, which necessarily included both Morrill and Jones, had alleged that they collectively had "purchased" goods and materials from the plaintiff, and the court viewed this allegation as a binding judicial admission that Morrill and Jones, although undisputedly guarantors, were also buyers of the goods for purposes of this action. With respect to the trim for the 11 Cornwall Road project, the court noted that it had failed expressly to address in its decision the defendants' claim that trim items were defective. Although the court found that the evidence presented supported a finding that certain trim pieces were defective, it nevertheless indicated that "[e]vidence was lacking as to any monetary amounts expended by the defendants in repairing or replacing the trim while waiting for the matter to be resolved with the plaintiff. This matter was not resolved prior to the defendants' loss of the property through foreclosure proceedings. Thus, the court could not determine how defective trim in the noted areas of the structure affected the value of the property when the foreclosure took place."[16]

## I

We begin with the defendants' claim that the court improperly granted the plaintiff's motion to strike four of their five counts of the revised counterclaim and subsequently rendered judgment on those stricken counts in favor of the plaintiff. Specifically, the defendants claim that, in striking their counts, the court misapplied the "transaction test" as set forth in Practice Book § 10-10. See footnote 2 of this opinion. We are not persuaded.[17]

At issue are counts two, three, four, and five of the revised counterclaim filed by the defendants on June 22, 2016. Count two purported to sound in abuse of process arising from the plaintiff's use of prejudgment remedies in the present action. Specifically, the gravamen of count two was that "[the plaintiff's] actions in filing prejudgment remedy attachments on [the defendants'] properties and bank accounts and its actions in filing mechanic's liens on property of customers of the [defendants] constituted an abuse of process in that such attachments and liens were filed with an improper motive and/or for an improper purpose in one or more . . . respects . . . ."

Count three, unlike the other counts at issue, was not labeled by the defendants as to the cause of action it purported to assert. It was comprised of only three paragraphs. The first two paragraphs alleged that the goods at issue in the plaintiff's complaint had been sold by Northwest Lumber and that Northwest Lumber was not a party to the agreement that was the subject of the plaintiff's breach of contract complaint. The final paragraph concluded that the defendants "sustained damages as a result of [the plaintiff] bringing this action against them and filing prejudgment remedy liens and mechanic's liens against them and [their] clients for goods that were sold and delivered by Northwest Lumber and not by the [plaintiff]."

The allegations in count four also pertained to the plaintiff's prejudgment remedies. More specifically, count four purported to assert an action for slander of title alleging, in relevant part, that the plaintiff had "caused prejudgment attachment liens to be placed against real estate owned by the [defendants], as well as against the [defendants'] bank account . . . when the [plaintiff] knew that the facts set forth in such application and affidavit were false and untrue."

Finally, count five incorporated the allegations from the earlier counts regarding the plaintiff's actions in securing prejudgment remedies. It asserted that the plaintiff's actions constituted a CUTPA violation "resulting in ascertainable losses and damages to the [defendants], including [their] inability to operate their businesses and several of such businesses were forced into bankruptcy and/or forced to close."

We now turn to the applicable law. "A counterclaim is a cause of action existing in favor of the defendant against the plaintiff and on which the defendant might have secured affirmative relief had he sued the plaintiff in a separate action. . . . A motion to strike tests the legal sufficiency of a cause of action and may properly be used to challenge the sufficiency of a counterclaim." (Emphasis omitted; internal quotation marks omitted.) *Ameriquest Mortgage Co.* v. *Lax*, 113 Conn. App. 646, 649, 969 A.2d 177, cert. denied, 292 Conn. 907, 973 A.2d

103 (2009). A motion to strike is also the proper vehicle to challenge whether a counterclaim has been properly joined with the plaintiff's action pursuant to the transaction test as set forth in Practice Book § 10-10. See *Bank of New York Mellon* v. *Mauro*, 177 Conn. App. 295, 315, 172 A.3d 303, cert. denied, 327 Conn. 986, 175 A.3d 45 (2017).[18] Although our review of a trial court's ruling on a motion to strike challenging the legal sufficiency of a pleading is ordinarily plenary, we apply a more deferential abuse of discretion standard when reviewing whether a court properly has granted a motion to strike a counterclaim upon a finding that it does not satisfy the transaction test. See id., 317. "In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *D'Ascanio* v. *Toyota Industries Corp.*, 133 Conn. App. 420, 428, 35 A.3d 388 (2012), aff'd, 309 Conn. 663, 72 A.3d 1019 (2013).

As previously noted, "Practice Book § 10-10 provides that [i]n any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff . . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint. . . . This section is a commonsense rule designed to permit the joinder of closely related claims [if] such joinder is in the best interests of judicial economy. . . . The transaction test is one of practicality, and the trial court's determination as to whether that test has been met ought not be disturbed except for an abuse of discretion." (Internal quotation marks omitted.) *South Windsor Cemetery Assn., Inc.* v. *Lindquist*, 114 Conn. App. 540, 546, 970 A.2d 760, cert. denied, 293 Conn. 932, 981 A.2d 1076 (2009).

"Our Supreme Court has instructed that the [r]elevant considerations in determining whether the transaction test has been met include whether the same issues of fact and law are presented by the complaint and the [counter]claim and whether separate trials on each of the respective claims would involve a substantial duplication of effort by the parties and the courts." (Internal quotation marks omitted.) Id., 547. In other words, proper application of the transaction test requires a trial court to consider "whether a duplication of judicial effort and resources would result if the subject of the complaint and counterclaim were tried in separate actions." *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, 81 Conn. App. 419, 423 n.3, 840 A.2d 578, cert. denied, 268 Conn. 922, 846 A.2d 881 (2004).

In ruling on the motion to strike in the present case, the court seemingly agreed with the argument advanced by the plaintiff that the challenged counts of the counterclaim did "not [arise] out of the claim made during

the breach of contract count." Although the court's brief order does not contain a precise discussion of the factual or legal basis for its conclusion; see footnote 12 of this opinion; it is entirely reasonable for us to infer, in the absence of any indication to the contrary, that the court predicated its ruling on the legal reasoning offered by the plaintiff as the proponent of the motion to strike and adopted the same. In support of its argument that the transaction test was not met, the plaintiff stated: "In this case, the plaintiff has sued for simple breach of contract. Although tort claims can arise out of the same transaction as a contract claim . . . they only do so when they are so connected to the complaint that [their] consideration is necessary for a full determination of the rights of the parties. . . . Here, whether the [credit] agreement was breached has absolutely nothing to do with the manner in which [the] ex parte [prejudgment remedy (PJR)] was obtained, nor the attachments made pursuant thereto. The consideration of the second, third, fourth and fifth counts of the revised counterclaim—all solely and directly related to the ex parte PJR—is completely unnecessary to determining whether, and to what extent, the [credit] agreement was breached. As a result, the second, third, fourth and fifth counts of the revised counterclaim do not arise out of the same transactions that serve as the basis of the complaint and, therefore, they should be stricken." (Citations omitted; internal quotation marks omitted.)

We conclude on the basis of our careful review of the pleadings that the court did not abuse its discretion by striking counts two through five of the counterclaim because the court reasonably could have concluded, as argued by the plaintiff, that, at their core, the stricken counts involved a different set of facts and law than were at issue in the breach of contract complaint. The propriety of the plaintiff's prejudgment remedies, their legal effect on the defendants and their customers, and the motivations of the plaintiff in utilizing them in this case present factual and legal issues that are distinct from those necessary to adjudicate whether the defendants breached the credit agreement that was the sole subject matter of the complaint. All the allegations made by the defendants in the stricken counts either involved issues relating to the plaintiff's use of prejudgment remedies, which, at best, are only tangentially related to the breach of contract action, or contained allegations that are simply duplicative of those contained in their response to the complaint, in the asserted special defenses, or in the remaining breach of contract count, which was not a subject of the motion to strike.

This court previously has stated that the "adjudication made by the court on the application for a prejudgment remedy is not part of the proceedings ultimately to decide the validity and merits of the plaintiff's cause of action. It is *independent of and collateral thereto*

and primarily designed to forestall any dissipation of assets by the defendant. . . . [P]rejudgment remedy proceedings . . . are not involved with the adjudication of the merits of the action brought by the plaintiff or with the progress or result of that adjudication." (Emphasis added; internal quotation marks omitted.) *Orsini* v. *Tarro*, 80 Conn. App. 268, 272–73, 834 A.2d 776 (2003).

In short, we cannot conclude on the basis of the record before us that the court's decision to disallow joinder of the defendants' counts would thwart the goal of judicial economy at the heart of the transaction test because their joinder undoubtedly would have expanded the focus of the trial proceedings to additional issues well outside the nexus of the breach of contract action before the court.[19] If the defendants elected to bring a separate action raising claims of abuse of process, slander of title and unfair trade practices flowing from the plaintiff's use of prejudgment remedies, adjudication of those claims would not necessarily "involve a substantial duplication of effort by the parties and the courts." (Internal quotation marks omitted.) *South Windsor Cemetery Assn., Inc.* v. *Lindquist*, supra, 114 Conn. App. 547.

Although we conclude that the court properly granted the motion to strike, the judgment rendered on those stricken counts nonetheless is incorrect as a matter of form. As this court recently explained, if a court determines that counts of a counterclaim are not part of the same transaction that is the subject of the complaint, the appropriate remedy is *not* a final judgment *on the merits* of the stricken counts but, rather, a judgment dismissing the counts of the counterclaim on the ground of improper joinder with the primary action. See *Bank of New York Mellon* v. *Mauro*, supra, 177 Conn. App. 320. Further, unless otherwise barred as a matter of law, such dismissal should be without prejudice to the right to replead any stricken claim in a separate action. Id. Here, rather than having rendered judgment on the stricken counts in favor of the plaintiff, the court should have rendered a judgment dismissing the stricken counts so as to preserve the defendants' right to pursue their claims, if possible, in a separate action. Because the court's judgment rendered in favor of the plaintiff on the four counts of the counterclaim could be misconstrued as a judgment on the merits, we reverse that judgment and remand with direction to render a judgment of dismissal with respect to the counts at issue.

## II

The defendants next claim on appeal that the court improperly rendered judgment on the merits of the complaint in favor of the plaintiff. The defendants raise several arguments in support of this claim. Specifically, they argue that the court improperly (1) relied on the allegation in their counterclaim that the plaintiff was

the seller of the goods as a judicial admission and also failed to credit overwhelming evidence that the actual seller was the plaintiff's wholly owned subsidiary, Northwest Lumber, (2) found, solely on the basis of a judicial admission, that Jones and Morrill were liable for damages as buyers rather than as guarantors, (3) failed to consider and properly resolve the defendants' defense of revocation of acceptance, (4) rendered judgment for the plaintiff despite finding that the plaintiff had refused to remedy or replace certain materials that the court determined were defective, and (5) incorrectly determined that the plaintiff had proven its damages to a reasonable degree of certainty. For the reasons that follow, we are not persuaded.

A

The defendants first argue that the court improperly found that the plaintiff established that it was the seller of the goods and materials at issue in the complaint such that it was entitled to damages for the defendants' nonpayment. The defendants contend that, in making this finding, the court improperly construed and relied on an allegation in their pleading as a judicial admission by the defendants that the plaintiff was the seller of the goods at issue. Further, the defendants contend that the court failed to credit what they describe as "overwhelming" evidence that the actual seller was the plaintiff's wholly owned subsidiary, Northwest Lumber. For the following reasons, we reject both contentions.

1

The defendants first argue that the court misconstrued an allegation in the breach of contract count of their revised counterclaim—namely, their allegation that they collectively had "purchased a sundry of material and goods *from* [*the plaintiff*]"—as a judicial admission that the plaintiff was, in fact, the seller of the building supplies at issue in this matter. We disagree.

"Factual allegations contained *in pleadings upon which the cause is tried* are considered judicial admissions and hence irrefutable as long as they remain in the case." (Emphasis added; internal quotation marks omitted.) *Bartlett* v. *Metropolitan District Commission*, 125 Conn. App. 149, 162, 7 A.3d 414 (2010), cert. denied, 300 Conn. 913, 13 A.3d 1101 (2011). "For a factual allegation to be held to be a judicial admission, the fact admitted should be one within the speaker's particular knowledge and one about which the speaker is not likely to be mistaken." *Mamudovski* v. *BIC Corp.*, 78 Conn. App. 715, 728, 829 A.2d 47 (2003), appeal dismissed, 271 Conn. 297, 857 A.2d 328 (2004). "An admission in pleading dispenses with proof, and is equivalent to proof. . . . It is the full equivalent of uncontradicted proof of these facts by credible witnesses . . . and is conclusive on the pleader. . . . A party is bound by a judicial admission unless the court,

in the exercise of its discretion, permits the admission to be withdrawn, explained or modified." (Citations omitted; internal quotation marks omitted.) *Days Inn of America, Inc.* v. *161 Hotel Group, Inc.*, 55 Conn. App. 118, 126–27, 739 A.2d 280 (1999). "The distinction between judicial admissions and mere evidentiary admissions is a significant one that should not be blurred by imprecise usage. . . . While both types are admissible, their legal effect is markedly different; judicial admissions are conclusive on the trier of fact, whereas evidentiary admissions are only evidence to be accepted or rejected by the trier. . . .

"In contrast with a judicial admission, which prohibits any further dispute of a party's factual allegation contained in its pleadings on which the case is tried, [a]n evidential admission is subject to explanation by the party making it so that the trier may properly evaluate it. . . . Thus, an evidential admission, while relevant as proof of the matter stated . . . [is] not conclusive. . . . As a general rule statements in withdrawn or superseded pleadings . . . may be considered as evidential admissions [of] the party making them, just as would any extrajudicial statements of the same import." (Citations omitted; internal quotation marks omitted.) *Nationwide Mutual Ins. Co.* v. *Allen*, 83 Conn. App. 526, 541–42, 850 A.2d 1047, cert. denied, 271 Conn. 907, 859 A.2d 562 (2004). The parties agree that whether the allegation in the defendants' counterclaim that they purchased materials from the plaintiff amounted to a judicial admission that the plaintiff was the seller of the goods involves interpretation of the pleadings and, thus, presents a question of law over which our review is plenary. See *Mamudovski* v. *BIC Corp.*, supra, 78 Conn. App. 727.

In the present case, in answering the question of who the actual seller of the building materials at issue was, the court expressly found that "the 'seller' of the goods and materials in this matter was . . . the named plaintiff, and [the plaintiff] has standing to bring this claim [for breach of contract]." The court noted multiple bases supporting this finding, including agreeing with the plaintiff's argument that the allegations by the defendants in their sole remaining count of their operative revised counterclaim dated June 22, 2016, amounted to a judicial admission that the plaintiff was the seller.[20]

Here, the defendants' one remaining breach of contract count in the counterclaim was, along with the complaint, a pleading on which the underlying case was tried. The defendants, who had the burden to establish that the plaintiff had breached the parties' agreement by, inter alia, supplying defective or nonconforming building materials, alleged in their counterclaim that they had "purchased a sundry of materials and goods from [the plaintiff]." The plaintiff admitted this allegation in its answer to the counterclaim. Whether the

plaintiff was the party that sold the materials to the defendants unquestionably was a fact that was within the defendants' particular knowledge as the buyer of the materials, and it was a fact about which they were not likely to be mistaken. Although the defendants attempt to explain away the legal import of their admission by arguing that they were entitled to argue in the alternative that Northwest Lumber rather than the plaintiff was the actual seller, and, in fact, had alleged such in other counts of their counterclaim, those alternative allegations were contained in counts that had been stricken and, thus, were no longer a part of the pleadings on which the case was tried. The defendants never sought the court's permission to withdraw or to amend their allegation after the granting of the motion to strike, and, therefore, the court, as the trier of fact, was entitled to rely on the defendants' own factual allegations, made in their operative pleading, as conclusively establishing the fact asserted therein, without any need for additional proof. Simply put, the defendants have failed to provide any basis on which we could conclude that the court committed legal error by recognizing uncontested allegations in the defendants' own pleading as a judicial admission.

2

We turn next to the defendants' related contention that, regardless of their admission, there was other "overwhelming" evidence before the court that Northwest Lumber was the seller. Even if we agreed that the court should not have treated the defendants' pleadings as constituting a judicial admission regarding the identity of the seller, as we have already indicated, that was not the sole basis that the court relied on in finding that the plaintiff was the seller. Contrary to the defendants' assertion, there was more than sufficient evidence in the record to support the court's factual finding that the plaintiff was the seller.

"Our standard of review of a challenge to a court's factual findings is well settled. [W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Palmer*, 88 Conn. App. 330, 336, 869 A.2d 666 (2005). "Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role." *Faulkner* v. *Marineland, Inc.*, 18 Conn. App. 1, 4, 555

A.2d 1001 (1989).

The court, as the trier of fact, was not required to credit any of the evidence offered by the defendants to establish that Northwest Lumber, rather than the plaintiff, was the actual seller. See *Wall Systems, Inc. v. Pompa*, 324 Conn. 718, 741, 154 A.3d 989 (2017) (trier of fact may credit some, all, or none of conflicting evidence). The question for this court is not whether there was "overwhelming" evidence to support the position taken by the defendants and rejected by the trier, but whether there was evidence in the record from which the court reasonably could have reached a contrary finding. The following evidence in the record amply supports the court's finding that the plaintiff was the seller.

The agreement itself identifies that the plaintiff was the party extending credit to the defendants for all materials purchased. Dan Sirois, who was the salesperson who provided the credit application to the defendants and who placed their orders for materials, testified that he was employed at all relevant times by the plaintiff and had in fact told the defendants that he worked for the plaintiff.[21] The plaintiff employed all of the persons who worked at its various retail locations, including at Northwest Lumber's location in Cornwall Bridge. Sirois testified that although most materials ordered by the defendants were supplied out of inventory located at the plaintiff's Northwest Lumber/Cornwall Bridge location, the plaintiff was the supplier of all materials provided to the defendants. The plaintiff paid for the rent, utilities, and insurance for the Cornwall Bridge location. The defendants had been provided with invoices for all materials purchased, copies of which were entered as exhibits at trial. The invoices had the plaintiff's name and logo printed on them. The invoices indicated that all payments should be remitted to the plaintiff. The defendants made some payments for materials to the plaintiff. As indicated by the court, despite claiming that Northwest Lumber was the seller and that payments had been made to it and not the plaintiff, Morrill had faxed authorization to the plaintiff to charge her credit card. The defendants also issued a payment by check that was made payable to the plaintiff. In response to a letter from the plaintiff demanding payment, which was written on the plaintiff's letterhead, Morrill sent a letter that referred to the balance that the plaintiff claimed it was owed for materials provided to the defendants, and she raised no concern in her letter that Northwest Lumber, rather than the plaintiff, was the actual seller of the goods at issue. Finally, all of the defendants' payments for material were deposited into accounts that were owned by the plaintiff. The plaintiff also collected and paid the sales taxes to the state for all materials that were sold out of its Cornwall Bridge location. The plaintiff was the entity that filed the tax returns for all its businesses, includ-

ing the former Northwest Lumber location in Cornwall Bridge.

Taken as a whole, there was evidence from which the court reasonably could have found that the plaintiff was the seller of the materials as alleged in both the plaintiff's complaint and the defendants' sole remaining count of the counterclaim. The defendants' arguments to the contrary simply amount to an invitation for this court to retry the issue and, thus, are unavailing.

### B

The defendants next argue that the court improperly found that Jones and Morrill were buyers of the goods sold by the plaintiff solely on the basis of a judicial admission in count one of the operative counterclaim. The defendants maintain that, in the absence of this admission relied on by the court, there was no evidentiary basis to support a finding that Jones and Morrill were buyers, and the lack of a separate count in the complaint seeking to impose liability on them as guarantors means that the judgment rendered against them was in error. We are not persuaded.

As we have already indicated, "[c]onstruction of the effect of pleadings is a question of law and, as such, our review is plenary. . . . Pleadings are intended to limit the issues to be decided at the trial of a case and [are] calculated to prevent surprise. . . . [The] purpose of pleadings is to frame, present, define, and narrow the issues, and to form the foundation of, and to limit, the proof to be submitted on the trial. . . . Accordingly, [t]he admission of the truth of an allegation in a pleading is a judicial admission conclusive on the pleader." (Internal quotation marks omitted.) *Brye* v. *State*, 147 Conn. App. 173, 177, 81 A.3d 1198 (2013). It is unnecessary to repeat our discussion of judicial admissions, which we set forth in part II A 1 of this opinion.

In its articulation, the court found that "Morrill and Jones acted in dual capacities as both buyers and guarantors." In making this finding, the court treated the same allegation in the defendants' counterclaim that we determined established that the plaintiff was the seller of the goods as a judicial admission that also established that Jones and Morrill were buyers. Specifically, the defendants alleged in paragraph one of the sole unstricken count of the counterclaim that "Counterclaim Plaintiffs, [RMM], [Todd Hill Properties], [Morrill] and [Jones], hereinafter referred to collectively as 'Counterclaim Plaintiffs,' *purchased* a sundry of materials from [the plaintiff]." (Emphasis added.) There are no allegations in the count that seek to distinguish Morrill and Jones as guarantors only. The plaintiff admitted the entirety of this allegation in its answer to the counterclaim. It was both legally and logically sound to construe that anyone who admittedly purchased goods

from the seller is a "buyer" of those goods.[22]

As the court concluded, because this action concerns the sale of goods, relevant provisions of the UCC apply. See General Statutes § 42a-2-102 (indicating that UCC "applies to transactions in goods").[23] Buyer is defined in the UCC as "a person who buys or contracts to buy goods." General Statutes § 42a-2-103 (1) (a). Because the verb "to purchase" is generally synonymous with the verb "to buy," the allegation by the defendants in their counterclaim that they collectively, including Morrill and Jones, purchased materials from the plaintiff properly was construed by the court as an admission by Morrill and Jones that they were buyers under the agreement. The fact that they also may have been guarantors of the debt is immaterial.

The defendants suggest that it should have been "unmistakably clear" from a review of the agreement, which was admitted into evidence, that Jones and Morrill signed the agreement only as guarantors, and thus we should view the court's contrary finding as clear error. The agreement, however, is, at best, ambiguous in establishing whether Jones and Morrill signed the agreement as guarantors, buyers, or both. Jones' signature appears on a line designated for "[p]ersonal [g]uarantor *or* [i]ndividual [b]uyer." (Emphasis added.) Neither designation is crossed out or circled on the form, leaving open to interpretation whether Jones signed as guarantor, buyer, or both. Morrill, the sole member of the two business defendants, signed the agreement in two places—once on a line designated for the "[p]ersonal [g]uarantor (2nd/[s]pouse)" and on a separate line as buyer in her representative capacity for the two business entities. The general terms and conditions section of the agreement, however, contained language indicating that the plaintiff was extending credit to the "[b]uyer or *any member of the business entity* . . . (hereinafter referred to as the 'buyer') . . . ." (Emphasis added.) Contrary to the defendants' assertion, therefore, the agreement is open to more than one possible interpretation as to the intent of the parties with respect to who constituted a buyer. Nevertheless, because a judicial admission is conclusive as to the facts admitted, it was not necessary for the court to look for or to consider any additional evidence or proof regarding the identity of the buyers or to resolve any ambiguity arising from the agreement. Because the court was entitled to rely on the defendants' judicial admission that they collectively purchased goods and materials from the seller and, thus, collectively were all buyers of those goods, a fact that the defendants were in a position to know, the defendants' assertion that the court's finding to that effect was clearly erroneous necessarily fails.

C

The defendants next argue that the court failed to recognize and properly address their defense of revoca-

tion of acceptance. The defendants posit that the court's analysis improperly focused on a legal standard applicable only to a claim of breach of warranty rather than addressing each of the elements of the defense of revocation of acceptance. We do not agree.

As we previously stated, this action is governed by relevant provisions of the UCC. The court's application of the UCC to the facts and circumstances in a given case presents a mixed question of fact and law over which we exercise plenary review. See *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 98 Conn. App. 784, 792, 912 A.2d 513 (2006), cert. denied, 281 Conn. 914, 916 A.2d 55 (2007). Further, to the extent that we must interpret the UCC or determine its applicability, these each present a legal question over which we also exercise plenary review. See *Seven Oaks Enterprises, L.P.* v. *Devito*, 185 Conn. App. 534, 545, 198 A.3d 88, cert. denied, 330 Conn. 953, 197 A.3d 893 (2018).

"Under article 2 [of the UCC], the rights and liabilities of the parties are determined, at least in part, by the extent to which the contract has been executed. The buyer's acceptance of goods, despite their alleged nonconformity, is a watershed. After acceptance, the buyer must pay for the goods at the contract rate . . . and bears the burden of establishing their nonconformity. . . . Acceptance does not, however, constitute a definitive election to waive all claims and defenses with respect to the accepted goods. If the buyer can demonstrate that he has been damaged by the nonconformity of the goods that he has accepted, he is entitled to recover such damages as he can prove. . . . Alternatively, if the buyer can demonstrate that the goods are substantially nonconforming, he is entitled, with some qualifications, to revoke his acceptance and recover the purchase price. . . . Whichever route the buyer elects, he is required to give timely notice to the seller within a reasonable time after he discovers or should have discovered the seller's breach." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Superior Wire & Paper Products, Ltd.* v. *Talcott Tool & Machine, Inc.*, 184 Conn. 10, 13–14, 441 A.2d 43 (1981).

"Under the [UCC], a buyer's revocation of acceptance is a distinct course of action not to be confused with rescission by mutual consent . . . nor is it an alternative remedy for breach of warranty. . . . When a buyer justifiably revokes acceptance, he may cancel and recover so much of the purchase price as has been paid. . . . On the other hand, the basic measure of damages for breach of warranty is the difference between the value of the goods accepted and the value that they would have had if they had been as warranted. . . .

"Section 42a-2-608 of the General Statutes sets up the following conditions for the buyer who seeks to justify revocation of acceptance:[24] (1) a nonconformity

which *substantially impairs the value to the buyer*; (2) acceptance (a) with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured, or (b) without discovery of the defect, when the acceptance is reasonably induced by the difficulty of the discovery or the seller's assurances; (3) revocation within a reasonable time after a nonconformity was discovered or should have been discovered; and (4) revocation before a substantive change occurs in the condition of the goods not caused by their own defects. *The buyer has the burden* of establishing any breach with respect to the goods accepted. . . . *Revocation of acceptance is possible only* [*if*] *the* [*nonconformity*] *substantially impairs the value of the goods to the buyer.* For this purpose, the test is not what the seller had reason to know at the time of contracting; the question is whether the [nonconformity] is such as will *in fact* cause a substantial impairment of value to the buyer though the seller had no advance knowledge as to the buyer's particular circumstances." (Citation omitted; emphasis added; footnote added; internal quotation marks omitted.) *Conte* v. *Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 120–21, 374 A.2d 144 (1976).

The defendants argue that, in ruling for the plaintiff, the court stated that, although it had sufficient evidence of the price the defendants had paid for the defective building materials, "there was no evidence as to the value of the windows, doors, and trim in their defective nonconforming condition . . . ." The defendants view this statement as evidence that the court focused on an element relevant only to proof of damages for breach of warranty, which General Statutes § 42a-2-714 (2) provides is calculated by measuring "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have if they had been as warranted." We agree with the defendants that the defense of revocation of acceptance was legally distinct from any assertion of damages for breach of a warranty. We do not agree, however, that the court's focus on the lack of evidence offered by the defendants regarding the value of the defective materials as received demonstrates that the court was applying an incorrect legal standard.

The court determined that the defendants had failed to present evidence that establishes to what extent any defects in the building materials had impaired the value of the goods delivered to the defendants. A nonconformity that *substantially impaired the value of the goods to the buyer* was a necessary element to justify a revocation of acceptance. Thus, the defendants had the burden to demonstrate not only the existence of a defect in materials provided by the plaintiff, but also needed to provide some evidence from which the court could determine that the defect complained of had caused a substantial impairment in the value of the goods. It is

this lack of evidence necessary to quantify the impairment in value that the court identified as the basis for rejecting the revocation of acceptance defense.

As the court properly recognized, the party claiming damages always has the burden of proving them with reasonable certainty, and a trial court "must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." *Bronson & Townsend Co.* v. *Battistoni*, 167 Conn. 321, 326–27, 355 A.2d 299 (1974). The court rejected and found not credible the testimony of the defendants' expert, John Downs, regarding replacement costs for nonconforming windows and doors provided for the defendants' 11 Cornwall Road project. The court concluded, among other things, that Downs' opinion was not based upon personal knowledge, that he had never inspected the windows or doors at issue, he was uncertain even of the number of windows affected, and "could not comment on whether or not settling of the new construction could have had an effect on the installed windows' [purported nonconformity]." (Internal quotation marks omitted.)

The defendants have not directed our attention to anything in the record that contradicts the evidentiary lacuna identified by the court. Instead, the defendants focus on the evidence they presented to the court regarding the costs that would be necessary to repair the identified defects or to replace the materials. But the court rejected this evidence as failing to demonstrate damages attributable to the defendants. The defendants had never sought to repair the defects when they controlled the properties at issue and could no longer incur the purported replacement or repair costs because, as found by the court and not challenged by the defendants, they had lost title to all relevant properties in foreclosure. Accordingly, any cost associated with repairing defects or obtaining replacement materials, even if proven, did not accurately reflect a recoverable measure of damages.

D

The defendants make a related argument with respect to their breach of contract count of the counterclaim, contending that the court improperly rendered judgment for the plaintiff despite having found that the plaintiff refused to remedy or to replace goods that the court determined were defective. More specifically, the defendants claim that the court misapplied § 42a-2-714 (2). We disagree.

Whether the court properly construed and applied § 42a-2-714 (2) of the UCC presents a question of law over which we exercise plenary review. Section 42a-2-714, which describes the measure of damages available to a buyer for a seller's breach in regard to accepted

goods, provides in relevant part: "(1) Where the buyer has accepted goods and given notification as provided in subsection (3) of section 42a-2-607 he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

Here, as with their revocation of acceptance defense, the defendants failed to prove any recoverable measure of damages. The court found that the defendants had failed to establish the value of the goods as accepted. Therefore, although the court found that the defendants had shown that some of the goods provided may have been nonconforming, the defendants failed to present evidence from which the court could calculate the value of the goods as they were received to compare with the value of the goods had they been received in proper condition, evidence of which presumably was the purchase price. Stated succinctly, the court's finding that the defendants had proven some of their allegations of nonconforming goods did not alleviate the defendants' burden to provide evidence from which the court could determine whether and to what extent the defendants were harmed by the nonconformities. The defendants' argument that the court misapplied § 42a-2-714 is unavailing.

E

Finally, the defendants argue that the court incorrectly determined that the plaintiff had proven the amount of its damages. According to the defendants, the plaintiff's accounting practices "were so shoddy that [it] could not prove with reasonable certainty that the defendants' owed the plaintiff anything." The plaintiff responds that the defendants have failed to demonstrate that the court's finding as to the amount of the debt owed to the plaintiff is clearly erroneous.[25] We agree with the plaintiff.

Well established legal principles govern our review of damage awards. In an action for breach of contract, "[t]he plaintiff has the burden of proving the extent of the damages suffered. . . . Although the plaintiff need not provide such proof with [m]athematical exactitude . . . the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 224, 990 A.2d 326 (2010). Our Supreme Court has held that "[t]he trial court has broad discretion in

determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled." (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 780, 43 A.3d 567 (2012). In other words, we are "constrained to accord substantial deference to the fact finder on the issue of damages." Id. Under the clearly erroneous standard, we will overturn a factual finding only if "there is no evidence in the record to support it . . . or [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, supra, 225.

In the present case, the court properly stated that it placed the burden of proving damages on the plaintiff and found that that the plaintiff had "established that the [unpaid] balance on the account due and owing to the plaintiff by the defendants at the time of the complaint was $68,886.58 . . . ." Although the court did not identify with any specificity the evidence that it relied on in reaching that conclusion, numerous invoices and account statements were submitted by the plaintiff as full exhibits. The court also heard extensive testimony about the account from several witnesses.

In particular, plaintiff's exhibit C contained copies of statements that accounted for all charges and payments from the time the defendants opened the credit account through the filing of the underlying action. A consolidated account statement with the closing date of December 31, 2008, showed recent charges of $1021.92, resulting in a total outstanding balance of $69,908.50. Subtracting those current charges for which payment was not then due and owing from the total new balance demonstrates a total overdue amount of $68,886.58, the precise amount awarded by the court as the amount due and owing under the contract when the underlying action was filed. Accordingly, there was evidence before the court from which it could make a fair and reasonable calculation of the amount of damages.

Although the defendants raised a number of challenges to the court related to damages, including claims that (1) they were charged for items that they never ordered or never received, and (2) the plaintiff had failed to credit them for certain payments they made, the court rejected each of these claims, concluding that the defendants had failed to meet their evidentiary burden of proof with respect to each claim. It was the exclusive function of the court as the trier of fact to

weigh the evidence and to evaluate the credibility of witnesses presented, and it was free not to credit evidence presented in support of the defendants' claims regarding damages.

Having reviewed the evidentiary record before the court and affording the trial court the broad discretion it is entitled to in calculating damages, we are not convinced that the damages award was clearly erroneous or that a mistake was made. Accordingly, we reject the defendant's claim that the plaintiff failed to meet its burden of proving damages "with reasonable certainty." (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, supra, 304 Conn. 780.

The form of the judgment with respect to stricken counts two, three, four and five of the counterclaim is improper, the judgment with respect to those counts is reversed and the case is remanded with direction to render judgment of dismissal on counts two, three, four and five of the counterclaim; the judgment on the complaint and on count one of the counterclaim is affirmed.

In this opinion the other judges concurred.

[1] Because the judgment rendered on those counts of the counterclaim did not dispose of all of the counts brought by the defendants against the plaintiff, it was not immediately appealable at the time the court rendered judgment on the stricken counterclaims. See Practice Book § 61-4.

[2] Practice Book § 10-10 provides in relevant part: "In any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff . . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint; and if necessary, additional parties may be summoned in to answer any such counterclaim . . . ."

[3] We have reordered, combined, or restated some of the defendants' appellate claims for purposes of clarity and comprehension. We also note that the defendants raised a number of additional claims on appeal directed at the court's decision to grant the motion to strike. Specifically, the defendants claim that the court (1) impermissibly relied on grounds not raised by the plaintiff in its motion to strike or supporting memorandum of law, (2) incorrectly concluded that the defendants had failed to state a proper cause of action for abuse of process, and (3) misinterpreted the defendants' allegation that they had not purchased goods from the plaintiff but from the plaintiff's wholly owned subsidiary as failing to state a legally cognizable counterclaim. Because we conclude that the court did not abuse its discretion by striking the four counts of the counterclaim on the basis that they failed the transaction test, it is not necessary for us to reach the merits of these additional claims of error. See also footnote 18 of this opinion.

[4] We rely on the facts as found and set forth by the court in its memorandum of decision on the merits of the plaintiff's complaint as well as on additional undisputed facts disclosed in the record.

[5] Specifically, the agreement provided: "All purchases made during the statement period will be paid for within [thirty] days from the statement date. Purchases paid within such time shall not incur a [finance charge]. . . . If payment is not made in accordance with the terms specified above, the [b]uyer will be deemed to be in default, and agrees to pay finance charges computed at the rate of [1.5 percent] per month on outstanding balances remaining unpaid [thirty] days after the prior statement date for the month in which purchase was made."

[6] The record shows that these enumerated "[d]ivisions"—whose names, addresses, and phone numbers appeared with the plaintiff's name and company logo on the agreement's header—corresponded with the plaintiff's retail business names and locations, presumably as they existed when the credit application form was printed. The parties executed the agreement nearly one year after the plaintiff had acquired Northwest Lumber and Hardware as a wholly owned subsidiary, but the credit application form does not reflect this acquisition.

[7] The defendants primarily were engaged in residential real estate development and construction.

[8] Invoices were generated on a triplicate form. As found by the court, "[i]f materials were delivered, the plaintiff's driver left a delivery copy of the invoice with the purchaser and brought the other two carbon copies to the plaintiff's office." The court noted that the "defendants admitted that they did not keep copies of the delivery portion of the invoice, despite some having been left at the job site." The court also indicated that the defendants presented no evidence contradicting the testimony of the plaintiff's manager, Jan Cohen, that "the prices charged for the goods and materials were the fair and reasonable amount," noting that the substance of the defendants' claims against the plaintiff concerned the delivery of allegedly defective or nonconforming goods rather than a dispute over pricing.

[9] The agreement states that it constitutes a commercial transaction as defined by General Statutes § 52-278a, and that the buyer and guarantor expressly agreed to waive all rights to notice and a hearing before prejudgment remedies could be imposed by the seller, which remedies include the garnishment of bank accounts and the attachment of property.

[10] It also purported to allege in the alternative that the defendants had overpaid for the goods and materials at issue or that those items were defective.

[11] Counts four and five of the counterclaim each incorporated by reference the contradictory factual assertions about the identity of the seller that the defendants made in their second and third counts. Although it is permissible under our pleading practices for a party "to plead various alternatives . . . even when those assertions are contradictory"; *Vidiaki, LLC* v. *Just Breakfast & Things!!! LLC*, 133 Conn. App. 1, 24, 33 A.3d 848 (2012); this right to plead in the alternative cannot account for a party's having alleged through incorporation two wholly irreconcilable factual assertions within a single count of a complaint or counterclaim.

[12] The court's ruling on the motion to strike stated in its entirety: "The plaintiff's motion to strike is hereby granted as to counts [two, three, four, and five]. The court finds that these counts do not [arise] out of the claim made during the breach of contract count. These matters are adequately made in count one. Count [three] should be stricken in that it does not set forth a cause of action. It is not a consumer action under CUTPA and it does not fall under the 'cigarette rule'. This is without prejudice to the right of the defendant[s] to reduce or resolve the prejudgment attachment, should it not be supported by probabl[e] cause or should it be excessive."

The court later denied a motion to reargue and an amended motion to reargue filed by the defendants. After this appeal was filed, the defendants sought articulation of, inter alia, the court's ruling on the motion to strike, arguing that Judge Radcliffe's order contained several ambiguities and lacked any legal analysis supporting its conclusions. Judge Radcliffe denied the motion for articulation without comment, and this court, in response to a motion for review filed by the defendants, granted review, but denied relief.

[13] The court relied on the following evidence as supporting its decision: the plaintiff was the actual owner of the materials provided to the defendants; the invoices given to the defendants indicated that payment should be remitted to the plaintiff; the plaintiff employed all of the persons who worked at its various locations, including at Northwest Lumber's location in Cornwall Bridge; the plaintiff paid for the rent, utilities, and insurance for the Cornwall Bridge location; all funds paid by the defendants were deposited into accounts owned by the plaintiff; the plaintiff collected and paid sales taxes to the state for all materials sold out of the Cornwall Bridge location; and the plaintiff filed "state and federal tax returns for business conducted at all its locations, including the Cornwall [Bridge] location." Further, the court noted that despite the defendants' assertions that Northwest Lumber was the seller, the evidence established that the defendants knowingly made payments for materials to the plaintiff. Specifically, the court mentioned that, despite asserting that payments had been made to Northwest Lumber, Morrill had faxed authorization *to the plaintiff* to charge her credit card. The defendants also issued a check made payable *to the plaintiff*. In response to a letter from the plaintiff, written on the plaintiff's letterhead, demanding payment, Morrill sent a reply letter that referenced the balance claimed by the plaintiff, she made no mention of Northwest Lumber, and raised no concern that the plaintiff was not the actual seller of the goods at issue.

[14] The defendants claimed that the plaintiff had provided defective windows, doors, trim and siding for the 11 Cornwall Road project. They also claimed that they received defective cedar shakes for a project at 75 Todd

Hill Road and a defective door for a project at 79 Todd Hill Road. In addition to their claims of defective materials, the defendants also sought damages based on the plaintiff's having changed a price quote for a railing system intended for a project at 90 Spooner Hill Road. The court determined that the defendants failed to present sufficient evidence needed to quantify its damages with respect to the 11 Cornwall Road and 75 Todd Hill Road projects, and rejected outright its claims of damages related to the 79 Todd Hill Road and 90 Spooner Hill Road projects.

[15] "[A] judgment on the merits is final for purposes of appeal even though the recoverability or amount of attorney's fees for the litigation remains to be determined." *Paranteau* v. *DeVita*, 208 Conn. 515, 523, 544 A.2d 634 (1988). On September 4, 2018, following a hearing, the court issued a decision awarding the plaintiff $35,346.87 in attorney's fees as well as postjudgment interest pursuant to General Statutes § 37-3a of 6 percent per annum. The defendants did not amend the present appeal or file a separate appeal challenging this ruling.

[16] The defendants filed a second motion for review arguing that the court's articulation failed to address adequately all elements of revocation of acceptance and asking this court for an order requiring the trial court to articulate further its decision. This court granted review, but denied the relief requested in the motion.

[17] As previously noted, because we conclude that the court did not abuse its discretion in striking the four counts of the counterclaim on the ground that they failed to satisfy the transaction test as asserted in the motion to strike, we do not address the defendants additional claims that the court improperly (1) granted the motion to strike in part on grounds not raised by the plaintiff in its motion, (2) determined that the defendants had failed to state properly a cause of action for abuse of process, and (3) concluded that the defendants could not maintain a counterclaim based solely on allegations that the goods at issue were not purchased from the plaintiff but from Northwest Lumber. Even if we reached the merits of these additional claims, however, the defendants would fare no better in obtaining a reversal of the court's ruling on the motion to strike. In ruling on a motion to strike, a court ordinarily should limit itself to the grounds on which the proponent of the motion relies. See *Gazo* v. *Stamford*, 255 Conn. 245, 259, 765 A.2d 505 (2001). The obvious rationale underlying this rule is that it would be unfair for a court to grant a motion on a ground of which the opposing party had no notice and against which it lacked an opportunity to defend. We are not convinced that this rationale is implicated in the present case. Here, the defendants' opposition to the motion to strike the counts of the counterclaim stated that its counts were "legally sufficient in that they properly set forth causes of action," which, reasonably construed, evinces an understanding by the defendants that the plaintiff's motion to strike, in addition to invoking the transaction test, also challenged the legal sufficiency of the counts to state a proper cause of action. Furthermore, the defendants have not directed our attention to anything that undermines the court's additional determination that a counterclaim that alleges nothing more than that the plaintiff was not the seller of the goods does not state any proper cause of action. Such an allegation properly can be construed only as a denial of the allegations in the complaint or an affirmative defense to breach of contract. Finally, a counterclaim sounding in abuse of process is premature and cannot lie in the very action that allegedly forms the basis for the alleged abuse of process. See *U.S. Bank National Assn.* v. *Bennett*, 195 Conn. App. 96, 107–108, 223 A.3d 381 (2019), citing *Larobina* v. *McDonald*, 274 Conn. 394, 407–408, 876 A.2d 522 (2005). Thus, the court's reliance on these additional bases for granting the motion to strike likely would provide us with proper alternative grounds for affirming the court's judgment in the present case. See *Gazo* v. *Stamford*, supra, 259.

[18] In *Bank of New York Mellon* v. *Mauro*, supra, 177 Conn. App. 295, this court also held "that a litigant may use a motion for summary judgment as a means of testing whether a party's counterclaims [fail to] satisfy the transaction test of [Practice Book] § 10-10." Id., 320.

[19] This opinion should not be misconstrued as holding that, in the face of a similar counterclaim, a court necessarily would abuse its discretion if it denied a motion to strike and allowed the defendants to proceed on such counterclaim. As indicated, proper application of Practice Book § 10-10 involves common sense, practicality, and requires accounting for a myriad of factors that reasonably could lead to different results.

[20] Although the court's recognition of the judicial admission arguably would have been conclusive and required no additional support, the court

nevertheless credited other evidence admitted at trial that supported its finding that the plaintiff was the seller, including noting that the defendants had made a number of allegations in earlier, superseded or stricken pleadings that the court considered as evidentiary admissions by the defendants that the plaintiff was the seller. The defendants do not challenge the court's analysis regarding its reliance on evidentiary admissions.

[21] Sirois testified that when Northwest Lumber was purchased by the plaintiff, the plaintiff kept the former Northwest Lumber signage in place, which could be confusing at times to customers. He explained: "I've always made a point to tell clients, you know, Northwest [Lumber] is owned by [the plaintiff] and how we kept the same—it was always Northwest Lumber from the prior owners so they didn't want to change the name because it's kind of hometown atmosphere, so they kept the name of the lumberyard owned by [the plaintiff]."

[22] That a party could be found to have dual status as both a buyer of goods and as a personal guarantor of debt incurred cannot be discounted as wholly implausible or illogical. There may be legal advantages for both sides in permitting a party to sign a contract for the sale of goods as both a buyer and as a guarantor. Although it is indisputable that both the buyer and the guarantor ultimately could be held responsible to the seller in the event of a failure to pay for goods under the contract, there are significant differences involved, both procedurally and substantively, depending on if the seller seeks to pursue a claim against a buyer or a guarantor. Furthermore, a party that is a buyer has additional duties to the seller and remedies available to it against the seller in the event of a seller's breach that would be unavailable to a guarantor. Accordingly, the court's finding is not facially implausible and, in this case, is supported by the parties' agreement.

[23] " 'Goods' " is defined in General Statutes § 42a-2-105 (1) in relevant part as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale . . . ."

The building materials at issue in this case certainly fall under that broad definition and, therefore, the commercial transactions between the parties fall within the purview of the UCC.

[24] General Statutes § 42a-2-608 provides: "(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. *It is not effective until the buyer notifies the seller of it.*

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." (Emphasis added.)

The defendants have not cited to any evidence in the record demonstrating that they timely notified the plaintiff of their choice to revoke acceptance other than to point at attempts they made to get the plaintiff to remedy the defects they discovered. As stated in the commentary to § 42a-2-608, however, revocation of acceptance "will be generally resorted to only after attempts at adjustment have failed"; Conn. Gen. Stat. Ann. § 42a-2-608 (West 2009), comment (4), p. 237; which can only mean that notifying a seller of perceived defects or nonconformity in goods received and accepted could not itself constitute proper notice of an intent to revoke acceptance of those goods. Because the court did not rely on or discuss a lack of notice as a basis for rejecting the defendants' revocation of acceptance defense, we do not address this issue further other than to note it could provide an alternative ground for rejecting the defendants' argument.

[25] The plaintiff also argues that the claim is inadequately briefed because the defendants failed to identify a standard of review. To the contrary, the defendants state in their brief that we should review whether the plaintiff proved damages with reasonable certainty under our clearly erroneous standard of review.